**Ruthann BARNES, Plaintiff,**

v.

**NORTHWEST IOWA HEALTH CENTER and SIOUX VALLEY HOSPITALS & HEALTH SYSTEM, Defendants.**

**No. C01–4060–MWB.**

United States District Court,
N.D. Iowa,
Western Division.

Nov. 18, 2002.

MEMORANDUM OPINION AND OR-
DER REGARDING PARTIES'
CROSS MOTIONS FOR SUM-
MARY JUDGMENT AND DEFEN-
DANTS' MOTION TO DISMISS
AND DEFENDANTS' MOTION TO
STRIKE

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. *INTRODUCTION* ...................................................... 1059
 A. *Procedural Background* ............................................ 1059
 B. *Disputed And Undisputed Facts* .................................. 1060

II. *SIOUX VALLEY'S MOTION TO DISMISS* ............................. 1061

III. *PARTIES' CROSS–MOTIONS FOR SUMMARY JUDGMENT* ............... 1063
 A. *Standards For Summary Judgment* ................................ 1064
 1. *Requirements of Rule 56* ...................................... 1064
 2. *The parties' burdens* ......................................... 1065
 3. *Summary judgment in employment discrimination cases* ......... 1065
 B. *Actual Disability Claims* ........................................ 1066
 1. *Analytical framework in general* ............................. 1066
 2. *Barnes's Actual disability claim: 42 U.S.C. § 12102(2)(A)* ..... 1068
 a. *Impairment* .............................................. 1068
 b. *Substantial limitations of major life activities* ............ 1069
 i. *Major life activities* .................................. 1070
 ii. *Substantially limited* ................................ 1070
 iii. *Import of Barnes's "flare-ups."* ...................... 1074
 iv. *Working* ............................................. 1078
 c. *Qualified individual* ..................................... 1080

 d. *Duty to accommodate* ..........................................1083
 e. *Adverse employment action* ...................................1089
 C. *"Record of Disability" Claims* ......................................1091
 D. *"Regarded As" Claims* .........................................1091

IV. *SIOUX VALLEY'S MOTION TO STRIKE* .................................1093

V. *CONCLUSION* ....................................................1095

## I. INTRODUCTION

Before the court in this employment discrimination case brought pursuant to the Americans with Disabilities Act and the Iowa Civil Rights Act are multiple motions filed by both the plaintiff, Ruthann Barnes ("Barnes"), and by the defendants, Northwest Iowa Health Center and Sioux Valley Hospitals & Health System (referred to collectively as "Sioux Valley"). Specifically, on September 5, 2002, the defendants filed a Motion To Dismiss Defendant Sioux Valley Hospitals & Health System, Or, Alternatively, Motion For Substitution Of Named Defendant (Doc. No. 21), as well as a Motion For Summary Judgment (Doc. No. 17). On the same day, the plaintiff filed a Motion For Partial Summary Judgment (Doc. No. 27).

### A. Procedural Background

Barnes filed this employment discrimination case on June 8, 2001. At this time, she also filed a jury demand, and a jury trial is scheduled in this case for January 27, 2003. The named defendants are Northwest Iowa Health Center and Sioux Valley Hospitals & Health System. The plaintiff alleges disability discrimination, and, as such, the action is brought pursuant to the *Americans with Disabilities Act* ("ADA"), 42 U.S.C. § 12101 *et seq.* and the *Iowa Civil Rights Act* ("ICRA"), Iowa Code ch. 216. The court's exercise of jurisdiction over this action is proper under 42 U.S.C. § 12117(a) (providing for original jurisdiction in the federal district courts) and 28 U.S.C. § 1367 (supplemental jurisdiction over state law claims).

In her complaint, Barnes sets forth several causes of actions—the first three counts assert violations of the ADA, and the fourth asserts a violation of the ICRA. Count I alleges discrimination based on her actual disability; Count II alleges discrimination based on a record of disability; Count III alleges discrimination because of a perceived disability; and Count IV asserts disability discrimination in violation of the ICRA.

As noted above, Barnes and Sioux Valley filed cross-motions for summary judgment on September 5, 2002. In her Motion For Partial Summary Judgment, Barnes contends that she has established a *prima facie* case on her failure-to-accommodate claims because of (1) an actual disability; (2) a record of disability; and (3) a perceived disability. In Sioux Valley's motion, it contends it is entitled to judgment as a matter of law because (1) Barnes is not disabled within the meaning of the ADA; (2) Barnes does not have a record of disability; (3) Sioux Valley did not perceive Barnes as disabled; and (4) Barnes was not qualified to perform the essential functions of the job for which she applied.

Also on September 5, 2002, Sioux Valley filed a motion to dismiss Sioux Valley Hospital & Health System. In the Motion To Dismiss, the defendants argue, *inter alia*, that Sioux Valley Health Hospitals & Health System is not a proper defendant to this litigation because Sioux Valley Health Hospitals & Health System was not Barnes's potential employer and, in the alternative, because this court lacks per-

sonal jurisdiction over that entity. The court will address this argument in turn.

Lastly, on October 22, 2002, Sioux Valley filed a motion to strike portions of Barnes's resistance papers, asserting they do not comply with the Federal and Local Rules, are not based on personal knowledge, and are inconsistent with prior testimony.

The court heard oral arguments on the parties' respective motions on November 8, 2002. In these arguments, the plaintiff was represented by Margaret M. Prahl of Heidman, Redmond, Fredregill, Patterson, Plaza & Dykstra LLP, Sioux City, Iowa. The defendants were represented by Cheryle Wiedmeier Gering of Davenport, Evans, Hurwitz, & Smith, Sioux Falls, South Dakota.

### B. Disputed And Undisputed Facts

Barnes is a Licensed Practical Nurse ("LPN"), and she also suffers from rheumatoid arthritis.[1] Barnes began her employ with Sioux Valley in 1988 as an LPN and, later, as a phlebotomist and laboratory assistant. When she was diagnosed with rheumatoid arthritis in 1992, she left her position and collected Social Security Disability benefits through April of 2002. In August of 2000, Barnes had had her arthritis under control with medication for over a year, and she felt ready to re-enter the workforce. Responding to a newspaper vacancy announcement, Barnes applied for an LPN position with Oak Park Care Center, which is a long-term residential care facility (also known as a nursing home) operated by defendant Northwest Community Health System.

Barnes completed an application for employment on August 10, 2000. Shortly after completing the application, Barnes interviewed with Judy Kuiper, the Director of Nursing at Oak Park. At the conclusion of this interview, Oak Park extended an offer of employment to Barnes. Sioux Valley contends the offer was contingent upon successful completion of a health assessment and a criminal background check, as well as production of a current LPN license. Barnes, however, argues that the offer was unqualified and that Sioux Valley retracted its offer, or "un-hired" her, after her health assessment, which will be discussed below, and without considering any reasonable accommodations. In any event, the parties agree that, but for the results of Barnes's health assessment, she would have been employed as an LPN at Oak Park.

After extending an offer, Cindy Woods, the assistant director of nursing, scheduled Barnes's employment orientation and made arrangements for Barnes to undergo a health assessment the following day with Cindy Freeman, an occupational health nurse. As part of this medical evaluation, Barnes filled out a health assessment form. On this form, she indicated she suffered from "rheumatoid arthritis controlled by medication" and that she had recently undergone surgery on her foot. In fact, the most recent of six foot surgeries took place only two weeks before she

---

1. Rheumatoid arthritis [("RA")] ... involves inflammation in the lining of the joints and/or other internal organs. RA typically affects many different joints. It can be chronic, which means it lasts a long time, and can be a disease of flares (active) and remissions (little to no activity).

RA is a systemic disease that affects the entire body and is one of the most common forms of arthritis. It is characterized by the inflammation of the membrane lining the joint, which causes pain, stiffness, warmth, redness and swelling. The inflamed joint lining, the synovium, can invade and damage bone and cartilage. Inflammatory cells release enzymes that may digest bone and cartilage. The involved joint can lose its shape and alignment, resulting in pain and loss of movement.

Arthritis Foundation, < http://www.arthritis.org/conditions/diseasecenter/ra.asp >.

completed the health assessment form on August 16, 2000. According to the defendants, Freeman placed Barnes on "medical hold" because of her recent surgery and diagnosis of rheumatoid arthritis. Being on medical hold meant that Barnes could not begin employment until Sioux Valley obtained additional data and made a determination that Barnes was physically capable of performing the duties associated with the LPN position. Freeman referred Barnes to Dr. David Hewitt, the company physician, for further evaluation and sought medical information and releases from Barnes's treating physician, Dr. David Robison, her orthopedic surgeon, Dr. Philip Deffer, and Dr. Wick.[2]

Both doctors Deffer and Robison released Barnes to work and provided those unconditional releases to Dr. Hewitt on Barnes's behalf. Specifically, on August 17, 2000, Dr. Deffer advised that Barnes "May return to work with no restrictions." [Pf.'s App., at 23]. Similarly, on August 21, 2000, Dr. Robison responded, stating that Barnes "is now able to return to work and perform duty as charge nurse." [Pf.'s App., at 22]. Dr. Hewitt performed his evaluation of Barnes on September 1, 2000. In addition, also on September 1, 2000, Barnes underwent a musculoskeletal exam performed by a physical therapist. Dr. Hewitt and the physical therapists are employed by Sioux Valley Business Health Services, which is part of the Sioux Valley Hospitals & Health System.

Prior to the health assessment, Sioux Valley provided Dr. Hewitt with a job description outlining the physical requirements for the LPN position:

She [Barnes] should be able to bend, stoop, squat, reach above shoulder level, kneel, balance, or twist occasionally (0–33%). She may occasionally be required to carry 25–50 lbs. with frequent carrying of 10 lbs:, frequent lifting of 10–50 lbs. with occasional lifting of 75 to greater than 100 lbs; frequent push/pull of 10–35 lbs. with occasional push/pull of 50–100 lbs.

[Deft.'s App., at 118].

Dr. Hewitt performed a variety of tests and concluded that, while "a return to work in some fashion is ultimately in the patient's best interest," "the physical demands of an LPN position as described in the job description may be in excess of what [Barnes] is physically capable of at this point." [Deft.'s App., at 119]. Specifically, Dr. Hewitt noted the following:

[I]t is unlikely that [Barnes] will be able to perform lifting of more than 25–30 lbs. on more than an occasional basis. Also due to her recent surgery, it is unlikely she would be able to tolerate prolonged standing or walking. She would otherwise be considered fit for duty with recommended restrictions of no lifting greater than approximately 25 lbs. and no prolonged standing or walking.... It was noted that it would be the employer's final decision as to whether they would be able to accommodate these restrictions.

[Deft.'s App., at 119].

Mary Ruyter, the former Director of Nursing at Oak Park, normally makes all hiring decisions. However, when Oak Park extended an offer of employment to Barnes, Ruyter was on vacation. When she returned from vacation, Freeman presented her with the results from her occupational health assessment and Dr. Hewitt's physical evaluation. Without consulting Barnes, or doctors Hewitt, Deffer, or Robison, Ruyter made the uni-

---

**2.** There is no indication in the record whether Dr. Wick ever responded to the defendants' request for Barnes's medical information.

lateral determination based on Dr. Hewitt's report that Barnes's restrictions affected the essential functions of the LPN position and that they could not reasonably be accommodated. Ruyter completed an "Essential Function Qualification Evaluation" and indicated on the form that accommodation of Barnes's restrictions would require the hiring of another individual to perform the tasks Barnes's restrictions precluded her from doing. Ruyter then instructed Woods to contact Barnes and to inform her that Sioux Valley was retracting its offer of employment. Woods met with Barnes on September 21, 2000, reviewed the Essential Function Qualification Evaluation form with Barnes, which Ruyter had already completed prior to the meeting, and informed her that Sioux Valley could not accommodate her in an LPN position at Oak Park.

## II. SIOUX VALLEY'S MOTION TO DISMISS

Defendants moved to dismiss Sioux Valley Hospitals & Health System out of this lawsuit (1) because Sioux Valley Hospitals & Health System is not a proper party defendant and/or (2) for lack of personal jurisdiction over Sioux Valley Hospitals & Health System. In the alternative, the defendants moved to substitute Sioux Valley Regional Health Services d/b/a Northwest Iowa Health Center, which is the properly named defendant, for Sioux Valley Hospitals & Health System. Barnes did not resist this motion.[3] Barnes conceded to the substitution of Sioux Valley Hospitals & Health System conditioned on the grounds that Sioux Valley Regional Health Services did not contest personal jurisdiction and that the substitution re-

lates back to the filing of the original complaint.

The ADA and the ICRA impose liability on employers. 42 U.S.C. § 12111(5)(A); Iowa Code § 216.2(7). Thus, in order to prevail on her claims, Barnes must demonstrate that each defendant was her "employer." See Loeckle v. State Farm Auto. Ins. Co., 59 F.Supp.2d 838, 846 (N.D.Iowa 1999) (dismissing one of named defendants for lack of employee-employer relationship) (citing Deal v. State Farm County Mut. Ins. Co., 5 F.3d 117, 118 (5th Cir. 1993) (affirming district court's order dismissing plaintiffs' Title VII and ADEA claims for lack of jurisdiction where plaintiff failed to establish that defendants were her employers)), aff'd 210 F.3d 379 (8th Cir.2000). Sioux Valley Hospitals & Health System asserts that it was not Barnes's employer or potential employer; therefore, it argues that it should be dismissed from this lawsuit.

Sioux Valley Hospitals & Health System is a South Dakota corporation and has not obtained a certificate of authority to do business in Iowa. It is also the parent corporation of Sioux Valley Regional Health Services. Sioux Valley Regional Health Services, not Sioux Valley Hospitals & Health System, operates Northwest Iowa Health Center, which, in turn, operates Oak Park Care Center in Sheldon, Iowa—the nursing home from which Barnes sought employment. The defendants concede that Sioux Valley Regional Health Services is a proper defendant to this action.

Here, Sioux Valley Regional Health Services had notice of the institution of Barnes's action. Further, Sioux Valley

---

**3.** The court notes that on September 25, 2002, the plaintiff moved to extend the deadline for her response to the defendants' motion for summary judgment. (Doc. No. 34). The court granted this motion on September 26, 2002. (Doc. No. 35). The plaintiff did not, however, seek any extension in relation to the defendants' pending motion to dismiss, and the court's September 26, 2002 order did not address that deadline.

Regional Health Services knew that, but for a mistake concerning the identity, or corporate structure, of the proper party, Barnes would have brought the action against Sioux Valley Regional Health Services, not Sioux Valley Hospitals & Health System. Therefore, the court grants the defendants' motion to dismiss Sioux Valley Hospitals & Health System from this lawsuit and to substitute Sioux Valley Regional Health Services as the proper party defendant. The court, furthermore, commends Sioux Valley Regional Health Services's forthright apprisal of the defect in the proper party defendant and its motion to substitute it as the proper party defendant.

And finally, because the court is granting the defendants' motion and dismissing Sioux Valley Hospitals & Health System on the ground that it is not a proper party defendant, the court need not address whether the court may exercise personal jurisdiction over that entity. Thus, to the extent the defendants' motion to dismiss was based on the lack of personal jurisdiction over Sioux Valley Hospitals & Health System, the motion is denied as moot.

### III. PARTIES' CROSS–MOTIONS FOR SUMMARY JUDGMENT

The plaintiff's Motion For Partial Summary Judgment solely seeks a determination that the plaintiff has established her *prima facie* case of disability discrimination on her failure-to-accommodate claims. In her brief, Barnes argues that she has established her failure-to-accommodate claims on her actual and record of claims (Counts I and II) and identified the defendants' retraction of their employment offer as the adverse employment action. However, in her brief, Barnes did not address her "regarded as" claim, nor did she address whether requiring her to undergo a second physical examination was discriminatory, as she plead in her complaint. Further, while Barnes does allege in her complaint that Sioux Valley's "unhiring" of her because of its perception of a disability was discriminatory, she did not brief the issue in support of her summary judgment motion. Thus, the only claims properly before the court on the plaintiff's Partial Motion For Summary Judgment are Count I and a portion of Count II—whether Sioux Valley failed to accommodate Barnes in violation of the ADA because of an actual or record of disability when it rescinded its offer of employment. Because this inquiry is inextricably linked to the defendants' Motion For Summary Judgment, in which the defendants contend that Barnes was not actually disabled, did not have a record of disability, was not regarded as disabled, and was not qualified for the LPN position, the court will largely not distinguish between the parties' discrete motions in its analysis of Barnes's claims.

Furthermore, when considering Barnes's disability claims, the court will generally make no distinction between claims based on federal law and comparable claims based on state law. This is appropriate because the elements of liability under the ADA and the ICRA are the same for federal and state claims. *See Montgomery v. John Deere & Co.*, 169 F.3d 556, 558 n. 3 (8th Cir.1999) (discrimination claims under ICRA are analyzed in same manner as their federal law counterparts); *Fuller v. Iowa Dep't of Human Servs.*, 576 N.W.2d 324, 329 (Iowa 1998) (recognizing that Chapter 216's prohibition on disability discrimination is the state-law "counterpart" to the ADA, and that, "[i]n considering a disability discrimination claim brought under Iowa Code chapter 216, we look to the ADA and cases interpreting its language. We also consider the underlying federal regulations established by the Equal Employment Opportunity Commission (hereinafter 'EEOC'), the

agency responsible for enforcing the ADA.") (internal citations omitted). Federal law, however, is not controlling. Iowa courts look simply to the analytical framework utilized by the federal courts in assessing federal law, and federal courts should not substitute the language of the federal statutes for the clear words of the ICRA. *Hulme v. Barrett,* 449 N.W.2d 629, 631 (Iowa 1989); *accord Board of Supervisors of Buchanan County v. Iowa Civil Rights Comm'n,* 584 N.W.2d 252, 256 (Iowa 1998) ("In deciding gender discrimination disputes, we adhere to the Title VII analytical framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668, 677–79 (1973). *See Hy-Vee Food Stores, Inc. v. Iowa Civil Rights Comm'n,* 453 N.W.2d 512, 516 (Iowa 1990).").

### A. Standards For Summary Judgment

This court has considered in some detail the standards applicable to motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure in a number of prior decisions. *See, e.g., Swanson v. Van Otterloo,* 993 F.Supp. 1224, 1230–31 (N.D.Iowa 1998); *Dirks v. J.C. Robinson Seed Co.,* 980 F.Supp. 1303, 1305–07 (N.D.Iowa 1997); *Laird v. Stilwill,* 969 F.Supp. 1167, 1172–74 (N.D.Iowa 1997); *Rural Water Sys. # 1 v. City of Sioux Ctr.,* 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997), *aff'd in pertinent part,* 202 F.3d 1035 (8th Cir.), *cert. denied,* 531 U.S. 820, 121 S.Ct. 61, 148 L.Ed.2d 28 (2000); *Tralon Corp. v. Cedarapids, Inc.,* 966 F.Supp. 812, 817–18 (N.D.Iowa 1997), *aff'd,* 205 F.3d 1347, 2000 WL 84400 (8th Cir.2000) (Table op.); *Security State Bank v. Firstar Bank Milwaukee, N.A.,* 965 F.Supp. 1237, 1239–40 (N.D.Iowa 1997); *Lockhart v. Cedar Rapids Cmty. Sch. Dist.,* 963 F.Supp. 805 (N.D.Iowa 1997). The essentials of these standards for present purposes are as follows.

### 1. Requirements of Rule 56

Rule 56 provides, in pertinent part, that "[a] party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof." Fed.R.Civ.P. 56(b). Further,

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is *no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

Fed.R.Civ.P. 56(c) (emphasis added).

Applying these standards, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but rather is to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.,* 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.,* 906 F.2d 1234, 1237 (8th Cir.1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman,* 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)); *accord Lockhart v. Cedar Rapids Comm. Sch. Dist.,* 963 F.Supp. 805, 814 n. 3 (N.D.Iowa 1997) (citing *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. 1348). As to whether a factual dispute is "material," the Supreme Court has explained, "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *accord Rouse v. Benson,* 193 F.3d 936, 939 (8th Cir. 1999).

### 2. The parties' burdens

Procedurally, the moving party bears the initial responsibility of informing the court of the basis for its motion and identifying the portions of the record showing a "lack of a genuine issue." *Hartnagel,* 953 F.2d at 395 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also Rose–Maston v. NME Hospitals, Inc.,* 133 F.3d 1104, 1107 (8th Cir.1998). When this burden is met, the party opposing summary judgment "must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. Instead, the opposing party is required to go beyond the pleadings and, by either affidavits or the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka ex. rel. United States v. Crane Co.,* 122 F.3d 559, 562 (8th Cir.1997). If the opposing party fails to make a sufficient showing of an essential element of a claim for which that party has the burden of proof, then the movant is "entitled to judgment as a matter of law." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.,* 113 F.3d 1484, 1492 (8th Cir.1997). In considering a motion for summary judgment, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348; *Quick,* 90 F.3d at 1377.

### 3. Summary judgment in employment discrimination cases

Because this is an employment discrimination case, it is well to remember that the Eighth Circuit Court of Appeals has cautioned that "summary judgment should seldom be used in employment-discrimination cases." *Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir.1994) (citing *Johnson v. Minnesota Historical Soc'y,* 931 F.2d 1239, 1244 (8th Cir.1991); *Hillebrand v. M–Tron Indus., Inc.,* 827 F.2d 363, 364 (8th Cir.1987), *cert. denied,* 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989)); *see also Snow v. Ridgeview Medical Ctr.,* 128 F.3d 1201, 1205 (8th Cir.1997) (citing *Crawford*); *Helfter v. United Parcel Serv., Inc.,* 115 F.3d 613, 615 (8th Cir.1997) (quoting *Crawford*); *Chock v. Northwest Airlines, Inc.,* 113 F.3d 861, 862 (8th Cir. 1997) ("We must also keep in mind, as our court has previously cautioned, that summary judgment should be used sparingly in employment discrimination cases," citing *Crawford*); *Smith v. St. Louis Univ.,* 109 F.3d 1261, 1264 (8th Cir.1997) (quoting *Crawford*); *Hardin v. Hussmann Corp.,* 45 F.3d 262, 264 (8th Cir.1995) ("[S]ummary judgments should only be used sparingly in employment discrimination cases.") (citing *Haglof v. Northwest Rehabilitation, Inc.,* 910 F.2d 492, 495 (8th Cir. 1990); and *Hillebrand,* 827 F.2d at 364). Summary judgment is appropriate in employment discrimination cases only in "those rare instances where there is no dispute of fact and where there exists only one conclusion." *Johnson,* 931 F.2d at 1244; *see also Webb v. St. Louis Post–Dispatch,* 51 F.3d 147, 148 (8th Cir.1995) (quoting *Johnson,* 931 F.2d at 1244); *Crawford,* 37 F.3d at 1341 (quoting *Johnson,* 931 F.2d at 1244). To put it another way, "[b]ecause discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant." *Crawford,* 37 F.3d at 1341; *accord Snow,* 128 F.3d at 1205 ("Because discrimination cases often turn on inferences rather than on direct evidence, we are particularly deferential to the nonmov-

ant.") (citing *Crawford*, 37 F.3d at 1341); *Webb v. Garelick Mfg. Co.*, 94 F.3d 484, 486 (8th Cir.1996) (citing *Crawford*, 37 F.3d at 1341); *Wooten v. Farmland Foods*, 58 F.3d 382, 385 (8th Cir.1995) (quoting *Crawford*, 37 F.3d at 1341); *Johnson*, 931 F.2d at 1244.

Nevertheless, the Eighth Circuit Court of Appeals also observed that "[a]lthough summary judgment should be used sparingly in the context of employment discrimination cases, *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir.1994), the plaintiff's evidence must go beyond the establishment of a prima facie case to support a reasonable inference regarding the alleged illicit reason for the defendant's action." *Landon v. Northwest Airlines, Inc.*, 72 F.3d 620, 624 (8th Cir.1995) (citing *Reich v. Hoy Shoe Co.*, 32 F.3d 361, 365 (8th Cir.1994)); *accord Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1134 (8th Cir.) (observing that the burden-shifting framework of *McDonnell Douglas* must be used to determine whether summary judgment is appropriate), *cert. denied*, 528 U.S. 818, 120 S.Ct. 59, 145 L.Ed.2d 51 (1999). More recently, in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the Supreme Court reiterated that " '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " *Reeves*, 530 U.S. at 142, 120 S.Ct. 2097 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).[4] Thus, what the plaintiff's evidence must show, to avoid summary judgment or judgment as a matter of law, is " '1, that the stated reasons were not the real reasons for [the plaintiff's] discharge; and 2, that age [or race, or sex, or other prohibited] discrimination was the real reason for [the plaintiff's] discharge." *Id.* at 153, 120 S.Ct. 2097 (quoting the district court's jury instructions as properly stating the law). The Supreme Court clarified in *Reeves* that, to meet this burden, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148, 120 S.Ct. 2097. The court will apply these standards to the parties' motions for summary judgment, addressing each of the disputed issues in turn.

## B. Actual Disability Claims

### 1. Analytical framework in general

The ADA affords protection from discrimination to any "qualified individual with a disability." 42 U.S.C. § 12112(a). "A plaintiff who raises a claim of disability discrimination bears the initial burden of establishing a *prima facie* case." *Lajeunesse v. Great Atlantic & Pac. Tea Co.*, 160 F.Supp.2d 324, 330 (D.Conn.2001) (citing *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 869 (2d Cir.1998); *Wernick v. Federal Reserve Bank*, 91 F.3d 379, 383 (2d Cir.1996)). If the plaintiff fails to establish any element of her *prima facie* case, then summary judgment may be appropriate. *Kellogg v. Union Pac. RR. Co.*, 233 F.3d 1083, 1086 (8th Cir.2000). However, if the plaintiff proves her *prima facie* case, the defendant must then articulate a legitimate, nondiscriminatory reason for its actions. *Id.* If the defendant successfully does so, the burden shifts back to the

---

**4.** In *Reeves*, the Supreme Court was considering a motion for judgment as a matter of law after a jury trial, but the Supreme Court also reiterated that "the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.' " *Reeves*, 530 U.S. at 150, 120 S.Ct. 2097 (quoting *Liberty Lobby, Inc.*, 477 U.S. at 250–51, 106 S.Ct. 2505). Therefore, the standards articulated in *Reeves* are applicable to the present motion for summary judgment.

plaintiff to demonstrate that the employer's proffered legitimate reason is merely a pretext for unlawful discrimination. *Id.* Thus, in order for Barnes to recover on her ADA claim, she must establish that, at the time she alleges she was discriminated against: (1) she was disabled within the meaning of the ADA; (2) she was qualified to perform the essential functions of the position; and (3) she suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination based on disability. *E.g., Dropinski v. Douglas County, Neb.,* 298 F.3d 704, 706 (8th Cir.2002) (outlining *prima facie* case of disability discrimination) (citing *Greer v. Emerson Elec. Co.,* 185 F.3d 917, 921 (8th Cir.1999); *Cooper v. Olin Corp., Winchester Div.,* 246 F.3d 1083, 1087 (8th Cir.2001) (same) (citing *Kiel v. Select Artificials, Inc.,* 169 F.3d 1131, 1135 (8th Cir.1999) (en banc)); *Heaser v. Toro Co.,* 247 F.3d 826, 830 (8th Cir.2001) (same); *Maziarka v. Mills Fleet Farm, Inc.,* 245 F.3d 675, 678 (8th Cir. 2001) (same); *Taylor v. Nimock's Oil Co.,* 214 F.3d 957, 959–60 (8th Cir.2000) (same); *Treanor v. MCI Telecomm. Corp.,* 200 F.3d 570, 574 (8th Cir.2000) (same); *Cravens v. Blue Cross & Blue Shield,* 214 F.3d 1011, 1016 (8th Cir.2000) (same); *Browning v. Liberty Mut. Ins. Co.,* 178 F.3d 1043, 1047 (8th Cir.1999) (same). "Discrimination includes 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability … unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer].'" *Heaser v. The Toro Co.,* 247 F.3d 826, 830 (8th Cir. 2001) (quoting 42 U.S.C. § 12112(b)(5)(A)) (alterations in original). Moreover, "[t]he proof necessary for discrimination cases is flexible and varies with the specific facts of each case." *Id.* (citing *Young v. Warner–*

*Jenkinson Co.,* 152 F.3d 1018, 1022 (8th Cir.1998)).

■ The threshold question in any disability discrimination case is whether a plaintiff is "disabled" within the meaning of the ADA. *See Brunko v. Mercy Hosp.,* 260 F.3d 939, 942 (8th Cir.2001) ("Because Brunko has not met the first element of actual or perceived disability of a prima facie case under the ADA, she is not entitled to protection under the ADA."); *Krauel v. Iowa Methodist Med. Ctr.,* 95 F.3d 674, 677 (8th Cir.1996) (stating that threshold requirement of ADA claim is establishing "disability"); *cf. Kellogg v. Union Pac. R.R. Co.,* 233 F.3d 1083, 1086 (8th Cir.2000) (stating that summary judgment is proper in ADA claim where plaintiff fails to establish any element of *prima facie* case). This is so because if a plaintiff is impaired but not statutorily "disabled," she or he will not fall under the "protective umbrella" of the ADA; thus, the ADA does not prohibit an employer from taking an adverse employment action against a plaintiff because of an impairment if that impairment does not qualify as a "disability" within the meaning of the ADA. *Browning,* 178 F.3d at 1048–49; *accord Lessard v. Osram Sylvania, Inc.,* 175 F.3d 193, 197 (1st Cir.1999) ("Under the ADA, not all impairments lead to protection.").

The ADA defines "disability" in three discrete ways: A disability within the meaning of the Act is "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Barnes has alleged that she is statutorily disabled based on all three definitions of "disability." The court will address each of the arguments in turn.

### 2. Barnes's Actual disability claim: 42 U.S.C. § 12102(2)(A)

Count I of Barnes's complaint alleges that she suffers from an actual disability and that Sioux Valley rescinded its employment offer because of that actual disability. In their cross-motions for summary judgment, the parties dispute whether or not Barnes's rheumatoid arthritis and related physical restrictions rise to the level of an actual disability.

 The Equal Employment Opportunity Commission ("EEOC") has issued regulations defining the three elements of disability contained in subsection (A).[5] *See* 29 C.F.R. § 1630.2 (2002). Those elements are: (1) a *physical or mental impairment;* (2) that affects a *major life activity;* (3) and whose effects *substantially limit* that activity. *See id.; accord Bragdon v. Abbott,* 524 U.S. 624, 631, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (directing district courts to perform three step inquiry to assess whether a particular condition constitutes a disability for purposes of subsection (A) of 42 U.S.C. § 12102(2)). "Physical or mental impairment" is defined as "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin, and endocrine." *Id.* § 1630.2(h)(1). "Major Life Activities" are defined as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.* § 1630.2(i). In addition, the Eighth Circuit has expanded upon the non-exhaustive list found in the regulations and has held that sitting, standing, lifting, and reaching may also qualify as major life activities. *Cooper,* 246 F.3d at 1088 (citing *Fjellestad v. Pizza Hut of America, Inc.,* 188 F.3d 944, 948 (8th Cir. 1999)); *cf. Bragdon,* 524 U.S. at 639, 118 S.Ct. 2196 (emphasizing that the regulations provide an illustrative, rather than exhaustive, list of major life activities). Further, in *Toyota Motor Manufacturing v. Williams,* 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002), the Court explained that " '[m]ajor life activities' ... refers to those activities that are of central importance to daily life." *Id.* at 691, 122 S.Ct. 681. The ADA's "substantially limits" requirement indicates that an impairment must interfere with a major life activity " 'considerabl[y]' or 'to a large degree.' " *Id.*

### a. Impairment

Plaintiff relies heavily on her diagnosis of rheumatoid arthritis in support of her contention that she is actually disabled and apparently seeks to place the burden on the defendants to produce evidence that "would create a genuine issue of material fact disputing that the plaintiff's rheumatoid arthritis interferes with major life activities." [Pl.'s br., at 10]. The defendants disagree with the plaintiff's assessment of her "disability" and argue that Barnes has not come forward with any evidence to

---

**5.** In *Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999), the United States Supreme Court assumed that the EEOC's interpretive guidelines were valid. *Albertson's,* 527 U.S. at 563 n. 10, 119 S.Ct. 2162. The Court stated that "for the purposes of this case, we assume, without deciding, that such regulations are valid, and we have no occasion to decide what level of deference, if any, they are due, *see Sutton v. United Air Lines, Inc.,* 527 U.S., at 479–480, 119 S.Ct. 2139, 144 L.Ed.2d 450." *Id.* Likewise in this case, the parties have not questioned the validity of the EEOC guidelines. In fact, both parties rely extensively on these guidelines in support of their arguments. Accordingly, this court, too, assumes without deciding that the regulations are valid.

prove that her rheumatoid arthritis substantially limits a major life activity. Furthermore, Sioux Valley points to Barnes's deposition, in which she states that, during the relevant time period, she was able to walk, eat, sleep, converse, comprehend, perform household chores, drive, and take care of her pets.

The parties do not dispute that Barnes's diagnosis of rheumatoid arthritis amounts to a physical impairment. Indeed, as a physiological condition that affects the musculoskeletal system, rheumatoid arthritis falls within the definition of "impairment" in the regulations defining "physical impairment" for purposes of the ADA. *See* 29 C.F.R. § 1630.2(h)(1). The fighting issues are instead whether Barnes's rheumatoid arthritis limits any of her major life activities and, if so, whether any such activities are substantially limited.

### b. *Substantial limitations of major life activities*

■ The Supreme Court recently addressed a disability claimant's burden under the ADA:

It is insufficient for individuals attempting to prove disability status under this test [of actual disability] to merely submit evidence of a medical diagnosis of an impairment. Instead, the ADA requires those "claiming the Act's protection . . . to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial."

*Toyota Motor,* 122 S.Ct. at 691–92 (quoting *Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555, 567, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999)) (alterations provided by *Toyota Motor* Court).

■■ In *Toyota Motor,* the Court emphasized the need to perform an individualized assessment of a person's physical impairment to determine whether that impairment substantially limits the major life activities of that particular person. *See id.* at 692. The Court reasoned that medical diagnoses alone are insufficient to qualify a person as disabled within the meaning of subsection (A) of the ADA because symptoms vary in degree and extent from person to person. *Id.* In *Toyota Motor,* the respondent suffered from carpal tunnel. *Id.* The Court noted the following:

An individualized assessment of the effect of an impairment is particularly necessary when the impairment is one whose symptoms vary widely from person to person. Carpal tunnel syndrome, one of respondent's impairments, is just such a condition. While cases of severe carpal tunnel syndrome are characterized by muscle atrophy and extreme sensory deficits, mild cases generally do not have either of these effects and create only intermittent symptoms of numbness and tingling. Studies have further shown that, even without surgical treatment, one quarter of carpal tunnel cases resolve in one month, but that in 22 percent of cases, symptoms last for eight years or longer. When pregnancy is the cause of carpal tunnel syndrome, in contrast, the symptoms normally resolve within two weeks of delivery. Given these large potential differences in the severity and duration of the effects of carpal tunnel syndrome, an individual's carpal tunnel syndrome diagnosis, on its own, does not indicate whether the individual has a disability within the meaning of the ADA.

*Id.*

Like carpal tunnel syndrome, the effects of rheumatoid arthritis vary widely from person to person. Barnes's physicians, Dr. Deffer and Dr. Robison, testified in their depositions that the symptoms of rheumatoid arthritis vary widely, that it is a disease that "waxes and wanes," and that it oftentimes resolves itself or subsides as

a person ages. Thus, because rheumatoid arthritis is a disease of degrees, like ADA claimants affected by carpal tunnel syndrome, the onus is on Barnes to come forward with the major life activities affected by the effects of her rheumatoid arthritis and to demonstrate that those effects substantially limit her identified major life activities.

■■■ *i. Major life activities.* However, Barnes identified in her moving papers no major life activities affected by her rheumatoid arthritis. To the contrary, the summary judgment record is replete with unrebutted evidence that Barnes's rheumatoid arthritis was under control in August of 2000 when she applied for an LPN position at Oak Park and that it had been under control for the previous two years. Apart from an inability to stand on her toes,[6] which was a temporary impairment caused by her foot surgery and not a symptom of her rheumatoid arthritis, Barnes did not identify any major life activities affected by her rheumatoid arthritis. She testified in her deposition that in August of 2000 her rheumatoid arthritis was not restricting any activities in which she wanted to engage but could not because of her disease. [Deft.'s App., at 19]. In addition, she stated that she was able to walk, eat, sleep, converse, perform household chores, drive, engage in hobbies, and take care of her dogs. [Deft.'s App., at 22]. Barnes, furthermore, stated that she walks a few blocks every day and that her rheumatoid arthritis was controlled by medication. [Deft.'s App., at 22].

The only restrictions, albeit unidentified as major life activities by the plaintiff, that affected Barnes during the relevant time period of her alleged disability are the lifting, standing, and walking restrictions imposed by Dr. Hewitt at the conclusion of Barnes's "Fitness for Duty Exam." How-

ever, Barnes explicitly does not argue that these activities of lifting, standing, and walking qualify as disabling limitations in her case. *See* 29 C.F.R. app. § 1630.2(i) (non-exhaustive list of major life activities, which includes walking, standing, and lifting). Nor would such an argument, *viewed in isolation,* prevail because, undercutting this argument would be Dr. Deffer's and Dr. Robinson's releases to work, which indicate that Barnes can return to work and that she has no restrictions. Furthermore, Dr. Hewitt opined that Barnes would unlikely be able to lift more than 25–30 pounds "on more than an occasional basis" and, because of her recent surgery, "it is unlikely she would be able to tolerate prolonged standing or walking." [Deft.'s App., at 119]. Sioux Valley contends that, because the lifting, standing, and walking restrictions were all related to Barnes's surgery, and, therefore, temporary, they do not constitute substantial limitations on major life activities as a matter of law.

*ii. Substantially limited.* Dr. Hewitt's report unmistakably indicates that Barnes's standing and walking restrictions were related to her recent foot surgery. Notably, the foot surgery was an outgrowth of Barnes's rheumatoid arthritis— the arthritis destroyed Barnes's ankle joint, which ultimately necessitated replacement. When Freeman asked for clarification as to whether the standing and walking restrictions were temporary, Dr. Hewitt responded that they would remain in effect until Barnes reached maximum medical improvement. [Deft.'s App., at 122]. The report is ambiguous as to whether the 25–30 pound lifting restriction was permanent. However, when reviewing the restrictions Dr. Hewitt imposed, Dr. Deffer disagreed with Dr. Hewitt's assessment insofar as Dr. Deffer interpret-

---

**6.** Barnes explicitly did not argue that stand- ing on her toes was a major life activity.

ed them to be permanent. Dr. Deffer testified:

> I think once her foot pain had settled down and she was up and moving, I think she would slowly work into lifting more and more, because she'd been sedentary, she'd been doing nothing. And certainly, initially she would be limited but that's with any work. And then when she started being more active, I think she could lift more. And I agree that, you know, prolonged standing and walking was going to be a problem because of her recent surgery, but even again, that would improve as she continued to walk and stand longer.

[Deft.'s App., at 170]. He further stated that, once Barnes had fully recovered from her foot surgery (in 4–6 weeks), her lifting restrictions would be "limitations of her stature," not specifically related to her rheumatoid arthritis. [Deft.'s App., at 172]. Limitations arising out of her rheumatoid arthritis, however, would occur during joint "flare-ups," which result in temporary incapacitation. Under ordinary circumstances, Barnes's "only limitation would be moving heavy patients," according to Dr. Deffer's notes following a September 21, 2000 examination of Barnes. [Deft.'s App., at 185].

As a matter of law, an "impairment's impact must be permanent or long term" to qualify as a *substantially limiting* impairment within the meaning of the ADA. *Toyota Motor*, 122 S.Ct. at 691 (citing 29 C.F.R. § 1630.2(j)(2)(ii)-(iii) (2001)); *accord Mellon v. Federal Express Corp.*, 239 F.3d 954, 957 (8th Cir.2001) ("Only a permanent or long-term condition will suffice" to qualify a person for the ADA's protection); *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 199–200 (4th Cir.1997) ("Based on the [EEOC] factors, it is evident that the term 'disability' does not include temporary medical conditions.... Applying the protections of the ADA to temporary impairments ... would work a significant expansion of the Act. The ADA simply was not designed to protect the public from all adverse effects of ill-health and misfortune.... Extending the statutory protections available under the ADA to individuals with broken bones, sprained joints, sore muscles, infectious diseases, or other ailments that temporarily limit an individual's ability to work would trivialize this lofty objective.") (internal citations omitted); *Lajeunesse*, 160 F.Supp.2d at 332 ("The plaintiff's condition improved after his surgery and much of the discomfort to which he refers was temporary. '[T]emporary injuries ... without substantial limitations and permanent effects[ ] do not warrant the protections of the ADA.' ") (quoting *Stronkowski v. St. Vincent's Med. Ctr.*, 1996 WL 684407, at *7 (D.Conn. Aug.1, 1996)); *Hutchinson v. United Parcel Serv., Inc.*, 883 F.Supp. 379, 395–96 (N.D.Iowa 1995) ("ADA regulations, as well as ADA interpretive guidance, make clear that temporary, minor injuries do not 'substantially limit' a person's major life activities.") (citing 29 C.F.R. §§ 1630.2(j), 1630 App., at 407); 29 C.F.R. app. § 1630.2(j) ("temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities").

Because the record is bereft of any evidence that Barnes's standing and walking restrictions imposed by Dr. Hewitt are permanent or long-term and because Barnes is able to perform these activities, albeit at a slowed pace and for shorter durations than before she was diagnosed with rheumatoid arthritis, the court finds that Barnes's major life activities of standing and walking are not substantially limited by her recent surgery. Indeed, there is no genuine issue of material fact that Barnes's standing and walking restrictions were anything other than temporary and arose out of her foot surgery. However,

that conclusion does not dispose of the inquiry because merely looking at Barnes's temporary restrictions ignores the fact that her rheumatoid arthritis is a chronic condition that gave rise to the need for the surgery, and looking solely at her temporary restrictions is a superficial and overly restrictive view of Barnes's limitations.

In *Gutridge v. Clure,* 153 F.3d 898 (8th Cir.1998), the Eighth Circuit addressed a similar, yet distinguishable, question: whether impairments while recovering from surgery were evidence of a disability under the ADA. In *Gutridge,* the plaintiff contended that he was actually disabled and, in the alternative, that he had a record of impairment *Id.* at 901. He contended that his permanent lifting restrictions substantially limited his major life activities of lifting and working. *Id.* The Eighth Circuit rejected his argument regarding working because Gutridge obtained subsequent employment in a similar position after being discharged from the defendant's employ. *Id.* Thus, he was not restricted in his ability to perform a class or broad range of jobs. *Id.* Furthermore, the court held that a lifting restriction of not more than forty-five pounds did not render him disabled as a matter of law. *Id.*

Finally, Gutridge argued that his five surgeries and recovery periods following them were evidence of a record of disability. *Id.* The Eighth Circuit disagreed. *Id.* The court held that "[d]isability under the ADA requires permanent or long-term impairments, and impairments while recovering from surgery are not evidence of a permanent disability." *Id.* (citing *Heintzelman v. Runyon,* 120 F.3d 143, 145 (8th Cir.1997)) (internal citations omitted).

In her resistance to the defendants' motion for summary judgment, Barnes acknowledges that the temporary restrictions arising out of her surgery do not qualify as statutory disabilities and that, in isolation, her abilities to lift, stand, and walk are not substantially limited. She states that she "does not rely on the lifting and walking restrictions imposed by the Defendant's doctor to establish her disability." [Pf.'s Resistance Br., at 9]. Nevertheless, she cites *Toyota Motor* and argues that "[i]f one activity does not independently qualify as a major life activity, but there are limits on several such activities, together than can be considered major." [Pf.'s Resistance Br., at 6]. The activities that Barnes urges this court to consider as a whole include: lifting, running, performing daily tasks, working, driving, bowling, playing golf, and engaging in social life. [Pf.'s Resistance Br., at 6].

The language cited by Barnes in support of her contention that this court should consider the cumulative effect of her rheumatoid arthritis on all of her life activities consists of the following: "If each of the tasks included in the major life activity of performing manual tasks does not independently qualify as a major life activity, then together they must do so." *Toyota Motor,* 122 S.Ct. at 691. While this is an attractive argument, it fails because the plaintiff has taken this statement out of context, and this court does not agree that the *Toyota Motor* decision supports the plaintiff's argument. First, the *Toyota Court* was exploring a single life activity—that of performing manual tasks. *See id.; accord Moysis v. DTG Datanet,* 278 F.3d 819, 825 n. 2 (8th Cir.2002) (commenting that the *Toyota Motor* Court's holding dealt with the major life activity of performing manual tasks). This test cannot be read to create a composite standard of major life activities under the ADA. While there may be precedent under the Social Security Act for taking a global view of impacted activities when no single impairment meets the standard of disability, cf. *Munson v. Barnhart,* 217 F.Supp.2d 162, 164 n. 2 (D.Me.2002) (explaining global

assessment of functioning scores and their utility to an ALJ's assessment of disability), Barnes did not cite, and this court has not found, authority to support a cumulative standard under the ADA. Indeed, unlike the Social Security Act, the language of the ADA appears to prohibit a "sum of the parts" analysis by defining "disability" as a substantial impairment that affects a major life activity.

█ Second, the focus of the *Toyota Motor* Court's explanation of what constitutes a "major life activity" is the Court's definition of the phrase as "activities that are of *central importance to most people's daily lives.*" *Id.* (emphasis added). Barnes has attempted to interpret *Toyota Motor*'s definition of "major life activity" as a subjective standard, while the Court clearly explicated an objective standard. "Major life activities do not include those activities that, although important to the individual plaintiff, are not significant within the meaning of the ADA." *Amir v. St. Louis Univ.*, 184 F.3d 1017, 1027 (8th Cir.1999) (citing *Land v. Baptist Med. Ctr.*, 164 F.3d 423, 425 (8th Cir.1999) (holding that attending day care is not a major life activity); *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 643 (2d Cir.1998) (holding that gardening, golfing and shopping are not major life activities), *cert. denied*, 526 U.S. 1018, 119 S.Ct. 1253, 143 L.Ed.2d 350 (1999)). Thus, while Barnes may have enjoyed recreational running, bowling, golfing, and expanded social activities before she developed symptoms of rheumatoid arthritis in 1992, these activities are not the ilk of activities that Congress intended to include as "major." Instead, major life activities include "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 45 C.F.R § 84.3(j)(2)(ii); *see also Toyota Motor*, 122 S.Ct. at 689 (citing with approval the regulations promulgated under the Rehabilitation Act defining major life activities).

Assuming without deciding that the activities identified by Barnes collectively rise to the level of comprising major life activities,[7] the court finds that Barnes has not met her burden of proving that these activities are "substantially limited." In *Toyota Motor*, the Court held that, to be substantially limited in a major life activity, "an individual must have an impairment that *prevents or severely restricts* the individual from doing activities that are of central importance to most people's daily lives." *Id.* (emphasis added). Barnes does not argue that she is prevented from engaging in activities, but rather that "[s]he is unable to do *anything to the extent* that she could before she was affected with rheumatoid arthritis." [Pf.'s Resistance Br., at 9] (italics added). Such a conclusory statement is insufficient to satisfy her burden under Federal Rule of Civil Procedure 56(c). *E.g., Mellon v. Federal Express Corp.*, 239 F.3d 954, 957 n. 4 (8th Cir.2001) (affirming district court's grant of summary judgment in employer's favor and noting that "the very general statements in plaintiff's deposition about her personal activities are not supplemented elsewhere or detailed enough to allow a fact finder to conclude the alleged restrictions are so serious in nature as to constitute 'substantial' limitations").

Rule 56(c) authorizes district courts to enter judgment as a matter of law "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material

---

7. Barnes does not argue to this court that recreational running, bowling, golfing, and engaging in social activities are "major life activities," nor would such an argument be meritorious.

fact." FED. R. CIV. P. 56(c). Barnes has come forward with no information or evidence indicating that she is "prevented or severely restricted" in engaging in the activities she identifies as collectively comprising a "major life activity." She walks for exercise, performs household chores, works 32 hours/week, cares for herself, and drives. Her conclusory statement that she does not perform certain activities "to the same extent" as she did before her diagnosis of rheumatoid arthritis simply fails to generate a genuine issue of material fact as to whether she is substantially limited in these activities. *See Cotter v. Ajilon Servs., Inc.,* 287 F.3d 593 (6th Cir. 2002) (" 'A single conclusory statement about an alleged substantial limitation is not enough to avoid summary judgment sought by the employer.' ") (quoting *Anderson v. Inland Paperboard & Packaging, Inc.,* 11 Fed. Appx. 432, 436, 2001 WL 406434 (6th Cir.2001)) (citing *Penny v. United Parcel Serv.,* 128 F.3d 408, 415 (6th Cir.1997) (holding plaintiffs bare allegation of a walking impairment did not suffice to prove that the impairment rose to the level of a disability)). Thus, in sum, the court largely agrees with Sioux Valley's contention that, when viewed in isolation, Barnes is not actually disabled because of the restrictions placed on her related to her recent surgery.

However, Barnes's restrictions must be viewed in the context of her impairment, because it is that impairment that gave rise to the surgery, which resulted in the temporary restrictions imposed by Dr. Hewitt. Having rejected the arguments pressed by the plaintiff, the court still cannot grant summary judgment in the defendants' favor on the question of whether Barnes is actually disabled, despite the scant evidence the plaintiff has presented. An additional consideration bears examination—the fact and significance of Barnes's "flare-ups."

### *iii. Import of Barnes's "flare-ups."*

In *Otting v. J.C. Penney Co.,* 223 F.3d 704 (8th Cir.2000), the Eighth Circuit Court of Appeals considered whether an epileptic woman was statutorily disabled. In *Otting,* the plaintiff suffered from epilepsy. *Id.* at 706. Despite medication and surgery, she continued to experience seizures. *Id.* at 710. Otting was a sales clerk at the department store J.C. Penney. *Id.* at 706. Throughout her employ with J.C. Penney, she worked in several departments, ranging from housewares, to fine jewelry, to women's clothing. *Id.* at 707. The last department in which Otting worked was the shoe department. *Id.* Apart from having to climb a ladder to reach stocked merchandise, the job duties in the shoe department mirrored the duties in all other J.C. Penney departments. *Id.* After a medical leave for treatment, Otting's doctor released her to work, with the sole restriction that she not climb ladders until she has been seizure-free for six months. *Id.* However, J.C. Penney refused to allow Otting to return to work and would not consider a transfer to another department. *Id.* at 707–08. Otting filed suit pursuant to the ADA, and a jury awarded her compensatory and punitive damages on her claim of disability discrimination. *Id.* at 706.

J.C. Penney appealed the district court's denial of its motion for judgment as a matter of law on the ground that Otting was not disabled as defined by the ADA because climbing ladders was the only activity Otting was prohibited from performing. *Id.* at 710. Because J.C. Penney argued that ladder-climbing was not a major life activity, J.C. Penney contended that Otting failed to prove she was substantially limited in a major life activity. *Id.* The *Otting* court agreed that ladder-climbing does not qualify as a major life activity. *Id.* However, the court disagreed with J.C. Penney's contention that ladder-climbing was the only activity af-

fected by Otting's epilepsy. *Id.* The court noted that Otting could not speak, walk, see, work, or control the left side of her body during her seizures. *Id.* Hence, the court reasoned that she suffered from a physical impairment that substantially limited the major life activities of walking, seeing, and speaking. *Id.* at 711. The court reached this result by "considering the record as a whole and the effects of Otting's impairment." *Id.* at 710.

Here, Barnes testified in her affidavit that she suffers from frequent flare-ups—approximately six per year. Furthermore, she testified that, during a flare-up, she is completely unable to care for herself. She testified that she cannot "get out of bed, get into or out of the bathtub, or accomplish the routine task of living" when her symptoms are flaring up. [Pl.'s Resistance App., at 2]. Her rheumatoid arthritis also causes other conditions, such as the deterioration of her ankle joint. The ability to care for oneself is at the root of what Barnes claims she is incapable of doing during an episodic flare-up, and such an ability is clearly a major life activity. *See* 29 C.F.R. app. § 1630.2(j)(i) (" 'Major life activities' include caring for oneself. . . ."). And while Barnes has not articulated as much, the court believes that she has generated a fact question as to whether her flare-ups and other rheumatoid arthritis-related conditions impact her major life activities of caring for herself, walking, standing, and lifting based on her generalized assessment of not being able to do anything and based on her doctors' statements that, during flare-ups, she is "completely disabled."

Barnes's flare-ups are analogous to the *Otting* plaintiff's seizures because during periods when Barnes's rheumatoid arthritis has manifested episodic flare-ups, Barnes cannot "do anything." Further, Barnes has generated a fact question as to whether the severity and chronic nature of her rheumatoid arthritis flare-ups render her rheumatoid arthritis an actual disability within the meaning of the Act. Thus, in sum, the court finds that Barnes has created a genuine issue of material fact as to whether her major life activities of caring for herself, walking, standing, and lifting are substantially limited by her rheumatoid arthritis because it causes severe flare-ups and other medical complications (for example, joint deterioration) that may be frequent enough and serious enough to rise to the level of a statutory disability, despite the fact she ordinarily is not substantially limited in any major life activities.

The record evidence is undisputed that rheumatoid arthritis is a chronic condition, and Barnes's doctors testified that she suffers from particularly painful bouts of flare-ups. Dr. Robison testified by deposition that Barnes "has a severe disease. I think it's been brought out by her history that she's going to have periods of time . . . where she'll go and she does fine. And then there are times and have periods where she'll have significant disability." [Pf.'s App., at 14]. That Dr. Hewitt's restrictions were imposed because of Barnes's recent ankle surgery, which was a direct outgrowth of her rheumatoid arthritis, distinguishes Barnes's case from *Gutridge.* The severity of Barnes's rheumatoid arthritis, which may qualify as a statutory disability under the facts in this summary judgment record, necessitated her surgery, whereas the *Gutridge* plaintiff's post-surgery restrictions arose out of a non-statutory disability.

According to the EEOC regulations, an impairment is "substantially limiting" if it renders an individual unable to perform a major life activity that the average person in the general population can perform, or if it significantly restricts the condition, manner, or duration under which an individual

can perform such an activity compared to the general population. 29 C.F.R. § 1630.2(j)(1)(i)-(ii); *accord Toyota Motor,* 122 S.Ct. at 691 ("We therefore hold that to be substantially limited in performing manual tasks, an individual must have *an impairment that prevents or severely restricts* the individual from doing activities that are of central importance to most people's daily lives.") (emphasis added). The regulations, furthermore, instruct district courts to look to the following factors in determining whether a person is substantially limited in a major life activity: (1) the nature and severity of the impairment, (2) its duration or anticipated duration, and (3) its long-term impact. *Aucutt v. Six Flags Over Mid-America, Inc.,* 85 F.3d 1311, 1319 (8th Cir.1996) (citing 29 C.F.R. § (j)(2)(i)-(iii)).

In Barnes's case, it is undisputed that rheumatoid arthritis is a chronic, permanent condition that is characterized by flare-ups and joint deterioration. Because the impairment is permanent, the court assumes that so, too, are its manifestations. In addition, Barnes testified that she experiences flare-ups approximately six times per year, though she did not testify as to the duration of these flare-ups. The court notes that, in her affidavit, Barnes stated that she has only missed six days of work in the past year because of her flare-ups. This may be evidence that her flare-ups do not substantially limit any major life activities because the duration of these flare-ups may be limited. The frequency of her flare-ups and other conditions also may not be so great as to substantially limit any major life activities. *Cf. Zirpel v. Toshiba Am. Info. Sys., Inc.,* 111 F.3d 80, 81 (8th Cir.1997) (although speaking and breathing were hampered during actual panic attack, disorder did not substantially limit plaintiff's major life activities where attacks were infrequent and very manageable). However, on the record before the court, Barnes's doctors' testimony as to the severity of Barnes's flare-ups combined with her assertion as to their frequency and with her medical records that indicate she has undergone several surgical procedures because of joint deterioration are sufficient to survive the defendants' motion for summary judgment.

The law of the Seventh Circuit supports this court's conclusion that Barnes has created a triable issue as to whether she is disabled within the meaning of 42 U.S.C. § 12102(2)(A). The Seventh Circuit recently addressed the issue of whether an ADA plaintiff who suffered from rheumatoid arthritis was actually disabled in *Moore v. J.B. Hunt Transport, Inc.,* 221 F.3d 944 (7th Cir.2000). In that case, the plaintiff experienced intermittent flare-ups one to two times per year. *Id.* at 952. Relying on another Seventh Circuit case, *Vande Zande v. Wisconsin Department of Administration,* 44 F.3d 538 (7th Cir. 1995), the *Moore* plaintiff argued that his flare-ups rendered his condition a statutory disability that must be accommodated, even though he may not have been substantially limited in any major life activity during other times when his rheumatoid arthritis was controlled. *Moore,* 221 F.3d at 952.

In *Vande Zande,* the plaintiff was paralyzed from the waist down, and her paralysis made her prone to developing pressure ulcers. *Vande Zande,* 44 F.3d at 543. The ulcers sometimes required the plaintiff to remain at home for several weeks, and she argued that she should have been allowed to work at home at these times. *Id.* The defendant employer in that ADA case argued that the ulcers were analogous to the EEOC regulations' illustration of a broken leg: an episodic temporary impairment that is not a disability. *Id.* The Seventh Circuit rejected this argument and held that "an intermittent impairment that is a characteristic manifestation of an admitted

disability is ... a part of the underlying disability and hence a condition that the employer must reasonably accommodate." *Id.* at 544.

The *Moore* plaintiff analogized his rheumatoid arthritis flare-ups to the pressure ulcers in *Vande Zande* and argued that his flare-ups rendered his condition a disability because he was unable to perform any tasks during these periods. *Moore*, 221 F.3d at 952. The *Moore* court rejected this reasoning and distinguished *Vande Zande*. *Id.* The *Moore* court stated: "Mr. Moore does not seek accommodation for an intermittent impairment resulting from an 'admitted disability'; instead, he attempts to use his intermittent flare-ups to establish that his impairment is a disability. *Vande Zande*, therefore, is not controlling." *Id.*

The Fourth Circuit employed similar reasoning in *EEOC v. Sara Lee Corp.*, 237 F.3d 349 (4th Cir.2001). In *Sara Lee*, the plaintiff suffered from epilepsy and, relying on *Vande Zande*, argued that her seizures rendered her condition a "disability." *Id.* at 352. Like the *Moore* court, the Fourth Circuit rejected the plaintiff's argument and similarly distinguished *Vande Zande* as follows:

> In that case, the employee was already disabled because she was paralyzed. This paralysis caused pressure ulcers which manifested themselves on an intermittent basis. But the [*Vande Zande*] court did not hold that the pressure ulcers themselves were a disability. Rather, they were symptoms of the underlying disability itself. Here, the alleged intermittent manifestation (the seizure) is the disability itself. To hold that a person is disabled whenever that individual suffers from an occasional manifestation of an illness would expand the contours of the ADA beyond all bounds.

*Sara Lee*, 237 F.3d at 352 (internal citation omitted).

The *Sara Lee* court also distinguished the Eighth Circuit's *Otting* decision. *See id.* The *Sara Lee* court said that, unlike the plaintiff in *Sara Lee*, the *Otting* plaintiff was prohibited by law from driving a car, could not take baths by herself for fear of drowning, and had undergone brain surgery to try and correct the seizures. *Id.* Conversely, the *Sara Lee* plaintiff experienced infrequent and relatively mild seizures. *Id.* Relying on the requirement of conducting an individualized assessment to determine disability, the *Sara Lee* court held that the *Sara Lee* plaintiff was not disabled because her seizures did not rise to the level of substantially limiting any of the plaintiff's major life activities. *Id.*

In this case, Barnes has generated a fact question as to whether or not her rheumatoid arthritis renders her statutorily disabled and, thus, whether her flare-ups and arthritis-related surgeries require accommodation. Unlike the plaintiffs in *Moore*, who suffered from mild rheumatoid arthritis, Barnes has generated a fact question as to whether or not she is actually disabled within the meaning of the ADA because she has created a factual dispute as to whether the frequency and severity of her flare-ups and joint deterioration interfere with major life activities. The facts of Barnes's case are most similar to the *Otting* case because, like Otting, Barnes suffers from frequent symptoms of her impairment, her impairment necessitates surgery and medication to control, and the condition is chronic. Because the symptoms of rheumatoid arthritis vary widely, it is probable that rheumatoid arthritis may be disabling for some individuals and not others. On the summary judgment record, the court is unable to conclude that no reasonable juror could conclude that Barnes's rheumatoid arthri-

tis substantially limits her in the major life activities of lifting, standing, walking, and caring for herself.

In addition, the *Moore* court hinted that, under circumstances not presented in *Moore*, rheumatoid arthritis flare-ups may be sufficiently severe to constitute a disability. In dicta, the *Moore* court stated, "Furthermore, we do not believe that Mr. Moore's infrequent flare-ups, one or two per year, render his condition a disability." *Moore*, 221 F.3d at 952. Barnes has indicated that she experiences frequent flare-ups, the consequence of which this court believes is sufficient to proceed to a jury trial on the question of whether her flare-ups result in a disabling impairment. In short, Barnes has come forward with sufficient evidence to generate a jury question on whether the limitations caused by her flare-ups and other rheumatoid arthritis symptoms are substantial in terms of her own experience.

It should be noted that Barnes arguably also contended in her brief that her major life activity of working is affected by her flare-ups.[8] The court emphasizes that Barnes only arguably raised this issue because the only context in which she briefed working as a major life activity was in the context of her "global view" argument. The EEOC regulations instruct courts to address the major life activity of working only when no other major life activity is substantially affected by an impairment:

> If an individual is not substantially limited with respect to any other major life activity, the individual's ability to perform the major life activity of working should be considered. If an individual is substantially limited in any other major

life activity, no determination should be made as to whether the individual is substantially limited in working. 29 C.F.R. app. § 1630.2(j). Because the court has found that Barnes has generated a genuine issue of material fact as to whether her medical problems substantially limit other major life activities, the court will only briefly address working as a major life activity.

■ *iv. Working.* "A person is substantially limited in working if she is 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities.'" *Fjellestad v. Pizza Hut of America, Inc.*, 188 F.3d 944, 949 (8th Cir.1999) (quoting *Doane v. City of Omaha*, 115 F.3d 624, 627 (8th Cir.1997)). The regulations direct district courts to consider factors, such as the number and type of jobs from which the impaired individual is disqualified; the geographical area to which the individual has reasonable access; and the individual's job training, experience, and expectations, in order to determine whether a person is substantially limited in the major life activity of working. 29 C.F.R. § 1630.2(j)(3)(ii); *accord Fjellestad*, 188 F.3d at 949 (listing above factors); *Helfter v. United Parcel Serv., Inc.*, 115 F.3d 613, 617 (8th Cir.1997) (same).

At oral arguments, Sioux Valley asserted that working is not a major life activity and argued that *Toyota Motor* supports this bold contention. While the court appreciates counsel's zealous advocacy, it does not read *Toyota Motor* to stand for the proposition that working is not a major

---

**8.** The court recognizes that the Supreme Court has not ruled conclusively that working constitutes a major life activity for purposes of applying the ADA. *See Toyota Motor*, 534 U.S. at 199–200, 122 S.Ct. at 692; *accord Kellogg v. Union Pacific R.R.*, 233 F.3d 1083,

1087 (8th Cir.2000) (assuming, without deciding, that working is a major life activity under the ADA) (citing *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 492, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) (same)).

life activity. To the court's knowledge, no federal court has read *Toyota Motor* in this light. Instead, the *Toyota Motor* Court only briefly touched on working as a major life activity because the major life activity at issue in *Toyota Motor* was performing manual tasks, not working. *Toyota Motor*, 122 S.Ct. at 692. The Court stated, "Because of the conceptual difficulties inherent in the argument that working could be a major life activity, we have been hesitant to hold as much, *and we need not decide this difficult question today.*" *Id.* (emphasis added).

▬▬▬ Like other major life activities, the determination of whether an individual is substantially limited in working must be made on a case-by-case basis. *Fjellestad,* 188 F.3d at 949 (personalized inquiry); *Webb v. Garelick Mfg. Co.,* 94 F.3d 484, 488 (8th Cir.1996) (same). In *Webb v. Garelick Manufacturing Co.,* the Eighth Circuit Court of Appeals explained that "[a] court must ask 'whether the particular impairment constitutes for the particular persona a significant barrier to employment.'" *Webb,* 94 F.3d at 488. Pertinent to defining the class of jobs used to determine disability are the persons's expertise, background, and job expectations. *Id.* "Finding that an individual is substantially limited in his or her ability to work requires a showing that his or her overall employment opportunities are limited." *Fjellestad,* 188 F.3d at 949 (citing *Miller v. City of Springfield,* 146 F.3d 612, 614 (8th Cir.1998)); *accord E.E.O.C. v. Woodbridge Corp.,* 263 F.3d 812, 815 (8th Cir.2001) ("In order to find that an individual is substantially limited in working, there must be a showing that his or her overall employment opportunities are limited.") (citing *Fjellestad,* 188 F.3d at 949); *Miller v. City of Springfield,* 146 F.3d 612, 614 (8th Cir. 1998) (same).

▬▬▬ In this case, Barnes has come forward with no evidence to create a fact

question as to whether her rheumatoid arthritis flare-ups substantially limit her major life activity of working. Proof that one is limited in the ability to perform either a class or broad range of jobs ordinarily entails evidence concerning the accessible geographic area, the numbers and types of jobs in the area foreclosed due to the impairment, and the types of training, skills, and abilities required by the jobs. *See* 29 C.F.R. § 1630.2(j)(3)(ii)(A)-(C); *see also Duncan v. Washington Metro. Area Transit Auth.,* 240 F.3d 1110, 1115–16 (D.C.Cir.) (en banc) ("[T]he ADA requires a plaintiff . . . to produce some evidence of the number and types of jobs in the local employment market in order to show he is disqualified from a substantial class or broad range of such jobs. . . ."), *cert. denied,* 534 U.S. 818, 122 S.Ct. 49, 151 L.Ed.2d 20 (2001); *Aucutt v. Six Flags Over Mid–America, Inc.,* 85 F.3d 1311, 1319 (8th Cir.1996) (employee not disabled within meaning of ADA absent evidence showing inability to perform class of jobs or broad range of jobs in various classes). By contrast, Barnes has adduced no evidence that the effects of her rheumatoid arthritis preclude her from performing any jobs, much less a broad range of jobs. In contrast, Barnes has specialized education as an LPN and has found subsequent employment as an LPN in a hospital, as well as work in a completely unrelated field as a cashier at Bomgaars, a retail outlet store. *See Brunko v. Mercy Hosp.,* 260 F.3d 939, 942 (8th Cir.2001) (holding ADA claimant, who was a nurse, was not substantially limited in major life activity of working as evidenced by fact that she worked in several nursing jobs after leaving employer); *accord Hutchinson v. United Parcel Serv., Inc.,* 883 F.Supp. 379, 396 (N.D.Iowa 1995) (finding the plaintiff was not "disabled" because her ability to perform work similar to that formerly required of her was "proof that she has not

been limited in this major life activity [of working]"). Thus, to the extent Barnes may have claimed that her rheumatoid arthritis substantially limits her major life activity of working, the court finds that she has failed to generate a material issue of genuine fact on this issue and grants summary judgment in Sioux Valley's favor on this claim.

### c. Qualified individual

■ Having found that Barnes has created a triable issue on her claim that she is actually disabled within the meaning of 42 U.S.C. § 12102(2)(A), the court turns next to the second element of her *prima facie* case: whether Barnes was qualified to perform the essential functions of the LPN position at Oak Park, with or without reasonable accommodation. *See, e.g., Dropinski v. Douglas County, Neb.*, 298 F.3d 704, 706 (8th Cir.2002) (stating second element of *prima facie* case under the ADA is whether the plaintiff "is qualified to perform the essential functions of his job with or without reasonable accommodation") (citing *Greer v. Emerson Elec. Co.*, 185 F.3d 917, 921 (8th Cir.1999)); *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1135 (8th Cir.1999) (en banc) (same); *Fjellestad*, 188 F.3d at 948 (same). To be a qualified individual within the meaning of the ADA, Barnes must (1) possess the requisite skill, education, experience, and training for her position; and (2) be able to perform the essential job functions, with or without

reasonable accommodation. 42 U.S.C. § 12111(8); *Moritz v. Frontier Airlines, Inc.*, 147 F.3d 784, 786–87 (8th Cir.1998); 29 C.F.R. § 1630.2(m). In this case, only the second element is in dispute. The parties appear to agree that Barnes's LPN certification and experience satisfy the first part of the ADA's definition of "qualified." Instead, Barnes and Sioux Valley part ways in their assessment of whether or not Barnes could perform the essential functions of the LPN position, with or without reasonable accommodation.

Sioux Valley resists Barnes's motion for partial summary judgment and urges its own motion, arguing that Barnes has presented no evidence to support a finding that she is "qualified." Apart from offering her résumé in support of her summary judgment motion, Barnes did not come forward with any evidence that she could perform the essential functions of the job with or without reasonable accommodation and, thus, she is not entitled to summary judgment on the ground she has established this element of her *prima facie* case. However, in her resistance to Sioux Valley's motion for summary judgment, Barnes addressed the second prong of the "qualified" definition. She asserts that the lifting and standing restrictions Dr. Hewitt imposed upon her could have been reasonably accommodated through the use of a wheel chair or additional help when the restriction involved lifting a patient.[9] Further, she asserts that the lifting and stand-

---

9. Though the parties did not address the question, Barnes is unable to work during flareups. Thus, one of the necessary functions of the LPN position that is affected by her rheumatoid arthritis is a fundamental one: attendance. The Eighth Circuit Court of Appeals has repeatedly held that attendance may be an essential function of a job. *See, e.g., Rinkenberger v. City of Clearwater*, 44 Fed. Appx. 23, 25, 2002 WL 1784844(8th Cir. Aug. 5, 2002) ("Attendance at work is an essential requirement of the job."); *Darby v. Bratch*, 287 F.3d 673, 682 (8th Cir.2002) ("Presence

at the job is no doubt essential, except in cases where the job could be done from home, which is not claimed here.") (citing *Nesser v. Trans World Airlines, Inc.*, 160 F.3d 442, 445–46 (8th Cir.1998)); *Maziarka v. Mills Fleet Farm, Inc.*, 245 F.3d 675, 681 (8th Cir.2001) (regular attendance is essential function of job where "[b]y its very nature, a receiving clerk's job is to be present to receive and sort merchandise upon arrival and to interact with freight drivers"); *Buckles v. First Data Resources, Inc.*, 176 F.3d 1098, 1100–01 (8th Cir.1999) ("In the context of the

ing functions of the LPN position are not essential. Sioux Valley strenuously objects to Barnes's argument and, with tendentious zeal, asserts that any such accommodation would put at risk the safety of the Oak Park residents, that there has been no showing that either accommodation is reasonable, and that both functions indeed are "essential."

 "An essential function 'means the fundamental job duties of the employ-

ment position the individual with a disability holds or desires. The term 'essential functions' does not include the marginal functions of the position.' " *Moritz*, 147 F.3d at 787 (quoting 29 C.F.R. § 1630.2(n)(1)). "Although an ADA plaintiff retains the ultimate burden of proving that [s]he is a qualified individual, an employer who disputes the plaintiff's claim [s]he can perform the essential functions must put forth evidence establishing those functions." *Maziarka v. Mills Fleet*

ADA, we have recognized that 'regular and reliable attendance is a necessary element of most jobs.' ") (quoting *Nesser*, 160 F.3d at 445); *Nesser*, 160 F.3d at 445 ("We have recognized that attendance at work is a necessary job function. 'An employee who is 'unable to come to work on a regular basis [is] unable to satisfy any of the functions of the job in question, much less the essential ones.' ") (quoting *Moore v. Payless Shoe Source, Inc.*, 139 F.3d 1210, 1213 (8th Cir. 1998) (internal citations omitted)) (citing *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 198 (4th Cir.1997); *Rogers v. International Marine Terminals, Inc.*, 87 F.3d 755, 759 (5th Cir.1996) ("Because [the plaintiff] could not attend work, he [was] not a 'qualified individual with a disability' under the ADA."); *Carr v. Reno*, 23 F.3d 525, 530 (D.C.Cir.1994) (coming to work regularly was an "essential function"); *Tyndall v. National Educ. Ctrs.*, 31 F.3d 209, 213 (4th Cir.1994) ("[A] regular and reliable level of attendance is a necessary element of most jobs.")).

While the parties have failed to develop this issue in the summary judgment record before the court because they did not foresee the court's finding in this regard, it seems apparent that attendance is an essential function of the practical nurse function. That is so because, as set forth by the job description provided to Dr. Hewitt, the LPN position entails the following responsibilities: "The Licensed Practical Nurse (LPN) gives general nursing care under the supervision/leadership of a Registered Nurse(s)(RN). Basic nursing care includes comfort measures, personal hygiene, and procedures for which the approved LPN educational programs have prepared him/her." [Pf.'s App., at 34]. These functions cannot be performed absent an employee's attendance because caring for Oak Park's residents is not the type of job that can be done

from home or that can go unfulfilled during Barnes's recovery period. Because Barnes cannot perform the essential functions of a practical nurse while she is experiencing flare-ups, the question presented, then, is whether she has shown that she is a qualified individual within the meaning of the ADA because she can perform the essential function of her job *with* a reasonable accommodation.

On the scant record regarding this issue before the court, the court believes that allowing Barnes to take sick leave during her flare-ups is probably the only plausible accommodation under the circumstances based on Barnes's assertion that she cannot do anything during these periods. Because the parties have not briefed this question, the court cannot grant summary judgment on this issue. However, Barnes stated in her affidavit that she has only missed six days of work due to her flare-ups in the past year. Pertinent to a reasonableness inquiry may include evidence of the average number of sick days taken by Oak Park employees and whether Barnes would need more than the average number. Further, evidence that Barnes's rheumatoid arthritis does not require her to take more sick days than allotted would be relevant. If her rheumatoid arthritis does increase her number of absences above the average and/or above that allowed, then this may constitute evidence from which a reasonable jury could conclude Sioux Valley's action in failing to hire Barnes was prompted by discriminatory animus. On the other hand, Sioux Valley may have failed to consider this accommodation simply because it had not considered the fact of Barnes's flare-ups at the time it made the decision to rescind its offer of employment.

*Farm, Inc.*, 245 F.3d 675, 680 (8th Cir. 2001) (citing *Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1113 (8th Cir. 1995)). In *Moritz v. Frontier Airlines, Inc.*, 147 F.3d 784 (8th Cir.1998), the Eighth Circuit Court of Appeals stated that an essential function may be established by evidence of the following:

(1) "[t]he employer's judgment as to which functions are essential"; (2) "[w]ritten job descriptions prepared before advertising or interviewing applicants for the job"; (3) "the amount of time spent on the job performing the function"; (4) "the consequences of not requiring the incumbent to perform the function"; and (5) "the current work experience of incumbents in similar jobs."

*Id.* at 787 (quoting 29 C.F.R. § 1630.2(n)(3)). Moreover, the regulations provide

A job function may be considered essential for any of several reasons, including but not limited to the following:

(i) The function may be essential because the reason the position exists is to perform that function;

(ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or

(iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or

ability to perform the particular function.

29 C.F.R. § 1630.2(n)(2).

Ruyters testified that the essential functions of the LPN position from which Barnes's lifting and standing restrictions precluded her from performing were: transferring residents safely, ambulating residents safely, handling emergencies, and pushing the medicine cart. [Pf.' Resistance App. at 25]. And while Barnes does not dispute that these are typical LPN responsibilities, she contends that they are not "essential," particularly for the evening shift, which she asserts she was hired to staff.[10] During the evening shift, residents are asleep so that ambulating and transferring resident and distributing medication are not ordinary functions and, therefore, not essential. Freeman confirms that the physical requirements of the LPN position are decidedly less strenuous during the night shift.

A determination of what functions are essential is fact-specific, and "[t]he inquiry into whether a particular function is essential initially focuses on whether the employer actually requires employees in the position to perform the functions that the employer asserts are essential." *Id.* at app. § 16302.(n). In this case, Barnes has generated a fact question as to whether evening shift employees, in particular, are actually required to perform the responsibilities that Sioux Valley claims are essential. Apart from Ruyter's testimony that *all* functions listed in the LPN job description[11] are essential, Sioux Valley has not demonstrated that lifting residents and

---

**10.** Sioux Valley contends that it does not hire practical nurses for any particular position but rather that it endeavors to comply with employees' preferences. Barnes has, however, created a fact question as to whether she was told she would be able to work the evening shift.

**11.** From a reading of Ruyter's deposition testimony, it is clear Sioux Valley prepared a practical nurse job description. However, neither party provided the court with a copy (other than that relied upon by Dr. Hewitt), and the court, therefore, could not grant summary judgment on the ground that Sioux Valley has established which functions of the LPN position are essential.

pushing the medicine cart are essential. First, there is a fact question as to whether those tasks are actually performed on the night shift. Second, Kuiper (the Director of Nursing at Oak Park) testified that, during the night shift, there are at least four aides on the floor, as well as two practical nurses. Hence, lifting assistance may be readily available, and a reasonable jury could conclude that the ability to individually lift a fallen resident, or with the help of only one other person, is not an essential function.

For that reason alone, Sioux Valley is not entitled to summary judgment on the ground that Barnes is not a "qualified individual." Furthermore, even if this court were to indulge in Sioux Valley's assumption that these functions are essential, Barnes has generated a jury question as to whether she could perform these functions with reasonable accommodation. For summary judgment purposes, the court considers only whether Barnes has demonstrated the existence of a genuine issue of material fact regarding her ability to perform those functions with reasonable accommodation. *See Nicholson v. Boeing Co.*, 176 F.3d 489, 1999 WL 270406, *7 (10th Cir. May 4, 1999) (table op.). In this case, Barnes has come forward with sufficient evidence to survive summary judgment because there is evidence that lifting residents, transferring residents, and assisting residents to ambulate are typically performed by more than one employee and, at times, with the assistance of a Hoyer lift, which is a device used for assistance in lifting. Moreover, even if Barnes were to be responsible for distributing medications during the evening shift, which would involve prolonged standing, she arguably could perform this function using a wheelchair. The court recognizes that Sioux Valley also argues that it is Barnes's burden to demonstrate that she can perform the essential functions in a manner that does not endanger the safety

of the Oak Park Care Center's residents. However, because Sioux Valley has not come forward with sufficient evidence to establish what those functions are that Barnes must prove she can safely accomplish, the court will not address this argument apart from commenting that the burden to establish her *prima facie* case at all times remains with Barnes.

### d. *Duty to accommodate*

 As noted above, "[d]iscrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir.1999); *accord* 42 U.S.C. § 12112(b)(5)(A). "Where an employee suffers from an actual disability (*i.e.*, an impairment that substantially limits a major life activity), the employer cannot terminate the employee [or take other adverse action against the employee] on account of the disability without first making reasonable accommodations that would enable the employee to continue performing the essential functions of his job." *Strippit*, 186 F.3d at 916. In this case, assuming that Barnes was not qualified to perform the essential functions of the LPN position without accommodation, the question remains whether she could perform it with accommodation and, furthermore, whether Sioux Valley failed to participate in the interactive process of determining whether accommodation would enable Barnes to fill Sioux Valley's LPN position.

Sioux Valley disputes that its actions in not engaging in a dialogue with Barnes were discriminatory for two primary reasons. First, Sioux Valley argues that the court need not reach the question of whether Sioux Valley's failure to engage in the interactive process was discriminatory because Barnes never requested accommo-

dation. Second, because it contends that there existed no reasonable accommodation that would have enabled Barnes to perform the essential functions of the job, Sioux Valley asserts that its failure to interact was harmless. Barnes, on the other hand, concedes that she did not request accommodation but argues that, because the need for accommodation was obvious and known to the employer, she was not obligated to initiate the interactive process.

There is no real dispute that Sioux Valley did not make an affirmative attempt to accommodate Barnes's restrictions. Instead, Ruyter compared Dr. Hewitt's restrictions to the LPN job description and determined that the restrictions precluded Barnes from filling the LPN position. Indicating as much, she completed an "Essential Function Qualification Evaluation" form and then had Woods review that form with Barnes. On the form, Ruyter concluded that the only accommodation that would have enabled Barnes to fulfill the LPN duties would have been to hire a second individual: "We would have to hire a second individual to perform the functions/duties of the job that this person would not be able to do; creating hardship for the facility." [Pf.'s App., at 37]. In short, Ruyter determined that the only possible way to accommodate Barnes's standing and lifting restrictions would have been an unreasonable accommodation. Further, Ruyter testified that the decision to rescind the offer of employment was made prior to the meeting between Barnes and Woods. Thus, an offshoot of Barnes's failure-to-accommodate claim is her contention that Sioux Valley violated the ADA by failing to engage in the interactive process of determining the reasonableness of an accommodation

In *Fjellestad v. Pizza Hut of America, Inc.*, 188 F.3d 944 (8th Cir.1999), the Eighth Circuit Court of Appeals explored employer liability for failing to engage in the interactive process:

An employer commits unlawful discrimination under the ADA if the employer does "not mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]." 42 U.S.C. § 12112(b)(5)(A). The ADA's regulations state that: "To determine the appropriate reasonable accommodation it may be *necessary* for the [employer] to initiate an informal, interactive process with the [employee] with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(*o*)(3). (emphasis added). The EEOC's interpretive guidelines also state that: "Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability." 29 C.F.R. § 1630, App. § 1630.9. (emphasis added). Other circuits have considered these regulations and interpretive guidelines and have written differing interpretations of them. Some circuits have concluded that both parties have a duty to act in good faith and assist in the search for appropriate reasonable accommodations. *See Taylor v. Phoenixville Sch. Dist.*, 174 F.3d 142, 157 (3d Cir.1999); *Beck v. University of Wis. Bd. of Re-*

*gents,* 75 F.3d 1130, 1135 (7th Cir. 1996); *Taylor v. Principal Fin. Group, Inc.,* 93 F.3d 155, 165 (5th Cir.1996). Other circuits have concluded that no such obligation exists and that an employer cannot be held independently liable under the ADA for simply failing to engage in an interactive process to determine reasonable accommodations. *See Barnett v. U.S. Air, Inc.,* 157 F.3d 744, 752–53 (9th Cir.1998); *Willis v. Conopco, Inc.,* 108 F.3d 282, 285 (11th Cir.1997); *White v. York Int'l Corp.,* 45 F.3d 357, 363 (10th Cir.1995).

We tend to agree with those courts that hold that there is no per se liability under the ADA if an employer fails to engage in an interactive process. However, we feel the interpretive guidelines set forth when it is "necessary" for an employer to initiate an informal interactive process with an employee in need of accommodation. The guidelines set forth the predicate requirement that when the disabled individual requests accommodation, it becomes necessary to initiate the interactive process. Although an employer will not be held liable under the ADA for failing to engage in an interactive process if no reasonable accommodation was possible, we find that for purposes of summary judgment, the failure of an employer to engage in an interactive process to determine whether reasonable accommodations are possible is prima facie evidence that the employer may be acting in bad faith.

*Id.* at 951–52.

 In concluding that an employer may be liable under certain circumstances for failing to engage in the interactive process to determine reasonable accommodation, the *Fjellestad* court cited with approval a Third Circuit case, *Taylor v. Phoenixville School District,* and employed the *Taylor* court's four-part analysis. *See id.* at 952. In *Taylor,* the Third Circuit held that an employer's obligation to participate in the interactive process is triggered once the employer knows of an employee's disability and the employee or the employee's representative has requested accommodation. *Taylor,* 174 F.3d at 158–59. To hold an employer liable, an ADA plaintiff must demonstrate the following factors to show that the employer failed to participate in the interactive process:

> "1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the · employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith."

*Fjellestad,* 188 F.3d at 952 (quoting *Taylor,* 174 F.3d at 165 (citations omitted)); *accord Ballard v. Rubin,* 284 F.3d 957, 960 (8th Cir.2002) (affirming grant of summary judgment in favor of employer on claim brought under Rehabilitation Act on ground employee did not request accommodation and employing four-part *Taylor* test to determine employer was not obligated to participate in the interactive process absent employee's request)[12];

---

**12.** While *Ballard* is a case brought under the Rehabilitation Act, the Eighth Circuit has held that cases interpreting this Act and the ADA are interchangeable. *See Ballard.* 284 F.3d at 960 n. 3 (citing *Allison v. Department of Corrections,* 94 F.3d 494, 497 (8th Cir.1996)

("Because the same basic standard and definitions are used under [the ADA and the Rehabilitation Act], cases interpreting either are applicable and interchangeable for purposes of our discussion.")) (alterations provided by *Ballard* court).

*Hatchett v. Philander Smith College*, 251 F.3d 670, 675 (8th Cir.2001) ("From the outset, the Court notes that an employee seeking a reasonable accommodation must request such an accommodation.") (citing *Mole v. Buckhorn Rubber Prods., Inc.*, 165 F.3d 1212, 1217 (8th Cir.1999)).

In Barnes's case, that Sioux Valley knew of Barnes's impairment is undisputed: she was discharged in 1992 because of her rheumatoid arthritis, and Barnes disclosed in her health assessment evaluation that she had rheumatoid arthritis, that she had undergone several arthritis-related surgeries, and that she was on medication to control her rheumatoid arthritis. In addition, the court finds that no reasonable jury could conclude that Ruyter's comparison of Dr. Hewitt's evaluation and the job description constituted participation in an interactive process. Ruyter did not discuss the physical restrictions with Barnes, nor did Ruyters seek further information from doctors Robison or Deffer, who both provided unrestricted releases to work. Having cleared two of the four hurdles to creating a triable issue on her failure-to-accommodate claim for Sioux Valley's failure to participate in the interactive process, Barnes is not yet out of the woods because it is undisputed that she did not request accommodation—an omission that Sioux Valley argues is fatal to her claim. In addition, she must generate a fact question as to whether she could have been reasonably accommodated.

In *Walsted v. Woodbury County*, 113 F.Supp.2d 1318 (N.D.Iowa 2000), the undersigned was confronted by a similar failure-to-accommodate claim in which the plaintiff did not request that her limited intelligence be accommodated. The employer argued that its obligation to participate in the interactive process was not triggered because the plaintiff did not specifically request accommodation. *Id.* at 1335. This court disagreed and held that " 'if an employee's disability and the need

to accommodate it are obvious, an employee is not required to expressly request reasonable accommodation.' " *Id.* at 1336 (quoting *Norris v. Allied–Sysco Food Servs., Inc.*, 948 F.Supp. 1418, 1436 (N.D.Cal.1996), *aff'd*, 191 F.3d 1043 (9th Cir.1999)) (citations omitted). Because it was admittedly "common knowledge" that the plaintiff had a significant learning disability, this court found that Woodbury County was required to initiate an interactive process with the plaintiff to determine the appropriate reasonable accommodation. *Id.* (citing *Fjellestad*, 188 F.3d at 952).

The Eighth Circuit Court of Appeals was recently called upon in *Ballard v. Rubin*, 284 F.3d 957 (8th Cir.2002) to address the same question—whether a failure to request accommodation is fatal to a failure-to-accommodate claim. The plaintiff in that case cited *Walsted* and a Seventh Circuit case, *Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281 (7th Cir.1996), for the proposition that the absence of an express request is not necessarily fatal to a failure-to-accommodate claim. *Ballard*, 284 F.3d at 961–62. The *Ballard* court implicitly agreed, but distinguished *Walsted* and *Bultemeyer* on the ground that they involved plaintiffs with mental disabilities. *Id.* at 964. The presence of mental disabilities distinguished *Walsted* and *Bultemeyer* because, where a plaintiff suffers from a mental disability, the communication process becomes more difficult, and it is incumbent on the employer to meet the employee half-way. *See id.* Because the *Ballard* plaintiff, whose disability was obvious because he wore leg braces and used crutches, suffered from no mental handicaps and had demonstrated his ability to perform a cerebral IRS job, the Eighth Circuit held that he knew how to make a request for accommodation and that his failure to do so was fatal to his failure-to-accommodate claim.

*Id.* This result was appropriate, according to the *Ballard* court, because, absent the request for accommodation, the employer's obligation to engage in the interactive process was not triggered. *Id.* Furthermore, explicating upon the reasoning for necessitating a request for accommodation despite an employer's knowledge of the disability, the court stated that a request for accommodation need not "invoke the magic words 'reasonable accommodation,' [but] the notice nonetheless must make clear that the employee wants assistance for ... her disability. In other words, the employer must know of both the disability and the employee's desire for accommodations for that disability." *Ballard,* 284 F.3d at 962 (quoting *Taylor,* 174 F.3d at 158–59); *see Lowery v. Hazelwood Sch. Dist.,* 244 F.3d 654, 660 (8th Cir.2001).

In this case, contrary to making a request for accommodation, Barnes disputed Sioux Valley's conclusion that her physical restrictions precluded her from performing as an LPN. She told Woods that she could do the job and that Dr. Hewitt's evaluation was inaccurate. Despite the fact Woods conceded that the meeting was not intended to be a process in which she was looking for Barnes's input, Woods testified that she responded to Barnes's contention that she could fulfill the LPN duties by telling Barnes that she was free to submit documentation from her physicians and that Woods would be happy to review them with occupational health. [Deft.'s App., at 162].

Nevertheless, there is sufficient record evidence to create a triable issue as to whether Barnes was given the opportunity to request accommodation. Woods and Ruyter testified that the decision to rescind Barnes's employment offer was made prior to the meeting between Woods and Barnes. Furthermore, Woods testified that, at this meeting, she informed Barnes that Woods "was sorry, that [Sioux Valley] could not at this time accommodate her in an LPN position." [Pf.'s App. at 28]. The facts of this case are distinguishable from the facts of the Eighth Circuit cases that hold a plaintiff is, *in general,* required to request accommodation before the ADA imposes upon an employer the obligation to participate in good faith in an interactive dialogue. *See, e.g., Ballard,* 284 F.3d at 961; *Fjellestad,* 188 F.3d at 952; *Mole,* 165 F.3d at 1217.

In those cases, the plaintiffs had been employed with the defendants for a significant period, whereas in Barnes's case, Sioux Valley extended an offer of employment, but Barnes had yet to begin her job. Barnes had no opportunity to interact with, much less to request accommodation from Sioux Valley before it unilaterally concluded that there existed no accommodations, short of hiring another individual, that would enable Barnes to perform the essential functions of the LPN position. Having been told at the first instance of post-offer communication between Barnes and her employer that no accommodations were possible, a reasonable fact-finder could conclude that it would have been fruitless to request accommodation.[13]

The Seventh Circuit's reasoning in *Bultemeyer* is instructive on this point:

---

13. This court's conclusion that any request for accommodation would have been fruitless is supported by the fact that post-termination requests for accommodation are not properly viewed as requests for accommodation at all but, rather, are requests for reinstatement. *Mole,* 165 F.3d at 1218. Because Sioux Valley had rescinded Barnes's offer of employment before giving her any opportunity to request accommodation, a finding that Barnes's claim fails because she did not request accommodation would result in the bizarre outcome that if an employer acts quickly enough, its discriminatory animus may be immune from liability under the ADA.

An employee's request for reasonable accommodation requires a great deal of communication between the employee and employer.... [B]oth parties bear responsibility for determining what accommodation is necessary.... "[N]either party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility."

*Bultemeyer,* 100 F.3d at 1285 (quoting *Beck v. University of Wis. Bd. of Regents,* 75 F.3d 1130, 1135 (7th Cir.1996)). Here, the cause for the breakdown is clear— Ruyter determined that Barnes could not perform the essential function of the job without accommodation and, furthermore, concluded that no reasonable accommodations were possible. Ruyter's unilateral decision that accommodation was unduly burdensome circumvented the purpose of the ADA's interactive dialogue requirement, and Sioux Valley cannot escape any potential liability merely because it cut the typical sequence of events off at the pass,[14] thus precluding Barnes from requesting accommodation and initiating the interactive process.

Moreover, a rational jury could determine that Sioux Valley's conclusion that no reasonable accommodation was possible, made prior to giving Barnes an opportunity to respond, is evidence of bad faith and discriminatory animus.

 Therefore, under the facts presented on this summary judgment record, summary judgment in Sioux Valley's favor on Barnes's failure-to-accommodate claim is not appropriate on the ground that Sioux Valley was not obligated to participate in the interactive process because Barnes failed to request accommodation. There is no question that Sioux Valley knew of Barnes's impairment and considered her physical restrictions to preclude her from performing the LPN position. In this court's view, both common sense and basic fairness command that, when an employer knows of an impairment,[15] concludes that the impairment precludes an employee from performing the essential functions of the job, and, in fact, "considers" accommodation, an employer cannot escape liability merely because the employee, having been told no accommodation was possible, fails to request accommodation, as is generally required to initiate the ADA's interactive process.

"To show that an employer failed to participate in the interactive process, a disabled employee must demonstrate," *inter alia,* "the employee could have been reasonably accommodated but for the employer's lack of good faith." *Taylor,* 174 F.3d at 165; *accord Fjellestad,* 188 F.3d at 951 (listing *Taylor* test); *Willis v. Conopco, Inc.,* 108 F.3d 282, 285 (11th Cir.1997) (holding that the employer's failure to in-

---

14. A typical chain of events may include: employee interviews for position, employee is offered position, employee then requests accommodation, employer and employee engage in dialogue to determine whether employee can be reasonably accommodated.

15. "[W]hether a defendant knows that a physical impairment is considered a disability is of no consequence. It suffices if the defendant knows the physical impairment exists." *United States v. City and County of Denver,* 49 F.Supp.2d 1233, 1241 (D.Colo.1999).

teract with the employee does not per se insulate the employee from losing on summary judgment because the employee must still prove that a reasonable accommodation could have been made). Here, the court found, above, that Barnes has generated a genuine issue of material fact as to whether she could have been reasonably accommodated and, consequently, whether she was a "qualified individual." She has set forth a *prima facie* case that Sioux Valley failed to engage in the interactive process, and, consequently, summary judgment would be inappropriate on her failure-to-accommodate claim on the ground that she is not qualified. Moreover, once a plaintiff has made a facial showing that a reasonable accommodation is possible, which Barnes has, the burden shifts to the employer to prove that it was unable to accommodate the plaintiff. *Benson*, 62 F.3d at 1115. Sioux Valley explored no accommodations outside of hiring another individual. It did not consider assistance in lifting, use of a Hoyer lift, or use of a wheelchair. Because Sioux Valley has not met its burden, the court denies Sioux Valley's motion for summary judgment on this ground as well.

### e. Adverse employment action

 The final element of a *prima facie* case of disability discrimination is whether the plaintiff was subject to an adverse employment action under circumstances that give rise to an inference of unlawful discrimination. *E.g., Moritz*, 147 F.3d at 786. In this case, the parties agree that Sioux Valley extended an offer of employment, which was later retracted because Sioux Valley determined that Barnes's physical limitations precluded her from performing the practical nurse position. The real dispute regarding this element, however, is whether Sioux Valley's offer was contingent upon successful completion of the health assessment or whether it was an unconditional offer of employment.

Barnes maintains that she was hired, that she was lead to believe she had "passed" the health examination conducted by Freeman, and that her scheduled orientation is evidence of the unqualified nature of the offer. Sioux Valley responds, arguing that its practice is to extend contingent offers and that the scheduling of Barnes's orientation does not demonstrate that the offer was unconditional because the appointment for the orientation was made at the same time Woods scheduled the health assessment.

The parties' dispute over this element under these facts is unclear. Assuming *arguendo* that Sioux Valley merely extended a contingent employment offer to Barnes and then retracted it because of her disability, 42 U.S.C. § 12112(b)(5)(A) still makes it unlawful to fail to provide reasonable accommodation to a job applicant unless such accommodation would pose an undue hardship. Thus, the court finds that the parties' dispute over the nature of the employment offer is immaterial and that Barnes was subject to an adverse employment action when Sioux Valley rescinded Barnes's offer. Further, because Sioux Valley admits that the impetus of its decision was Barnes's physical restrictions, the court concludes that a reasonable jury could infer discriminatory animus underlying Sioux Valley's decision to retract its offer of employment.

### C. Failure–To–Accommodate: "Record Of" and "Regarded As" Claims

While many disability discrimination claims are cognizable regardless of whether a plaintiff is "disabled" within the meaning of 42 U.S.C. § 12102(2)(A), (B), or (C), a plaintiff can establish the first prong of her *prima facie* case of a failure-to-accommodate claim only by showing she was "disabled" within the meaning of subpart A. The court, above, found that Barnes has come forward with sufficient evidence to proceed to a jury trial on the question of

whether she was actually disabled within the meaning of 42 U.S.C. § 12102(2)(A). Wholly apart from claiming that she is actually disabled, Barnes also contends that Sioux Valley discriminated against her because of her record of disability, under 42 U.S.C. § 12102(2)(B), and that Sioux Valley regarded her as disabled, under 42 U.S.C. § 12102(2)(C)—the remaining two alternative definitions of "disability" under the ADA.

Counts II, III, and IV of Barnes's complaint each assert three separate claims: (1) failure-to-accommodate; (2) failure to employ; and (3) improper testing. However, on summary judgment, Barnes did not address any claim other than her failure-to-accommodate claims. Thus, the remaining question before the court on the plaintiff's partial motion for summary judgment is whether Barnes's failure-to-accommodate claims, based on her alleged record of disability and perceived disability, will survive summary judgment. The court finds that they will not.

 The ADA does not impose upon an employer the duty to accommodate a qualified "disabled" employee when the employee is statutorily disabled within the meaning of 42 U.S.C. § 12102(B) (record of impairment) or 42 U.S.C. § 12102(C) (regarded as disabled).[16] *See Weber v.*

*Strippit, Inc.*, 186 F.3d 907, 917 (8th Cir. 1999) (holding that " 'regarded as' disabled plaintiffs are not entitled to reasonable accommodations"); *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 n. 2 (3d Cir.1999) (commenting that extending a duty to accommodate to "record of" claims is plagued by the same concerns as allowing a duty to accommodate claim to a "regarded as" plaintiff, but expressly not deciding the issue); *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 509 n. 6 (7th Cir.1998) (strongly suggesting that employer does not incur a duty to accommodate an employee based on a history of a substantially limiting impairment when current limitations are not substantial); *Gilday v. Mecosta County*, 124 F.3d 760, 764 n. 4 (6th Cir.1997) (illustrating a reasonable request for accommodation and stating "[t]hat such a person could request accommodation means that he is actually physically disabled under the Act, and not merely considered to be disabled or have a record of disability. *Compare* 42 U.S.C. § 12102(2)(A), *with id.* § 12102(2)(B), (C). A person without an actual disability would not need any accommodation."). Thus, no cause of action lies for an employer's failure to accommodate a disabled employee unless that employee is actually disabled within the meaning of 42 U.S.C. § 12102(A).[17] Therefore, the court grants

16. To date, the Fifth and Sixth Circuits have, like the Eighth Circuit, held that "regarded as" employees are not entitled to reasonable accommodations. *See Strippit*, 186 F.3d at 917; *Workman v. Frito–Lay, Inc.*, 165 F.3d 460, 467 (6th Cir.1999); *Newberry v. Eastern Tex. State Univ.*, 161 F.3d 276, 280 (5th Cir. 1998). The First Circuit, however, has held that "regarded as" ADA plaintiffs are entitled to reasonable accommodations. *Katz v. City Metal Co.*, 87 F.3d 26 (1st Cir.1996).

17. The Eighth Circuit has not squarely addressed whether a failure-to-accommodate claim is a viable cause of action when the ADA plaintiff is disabled because of a "record of" disability. However, the Eighth Circuit's

reasoning in *Strippit*, in which the court rejected a failure-to-accommodate a perceived disability claim, is indicative of this Circuit's stance on the issue. In *Strippit*, the court reasoned that "[t]he ADA cannot reasonably have been intended to create a disparity in treatment among impaired but non-disabled employees, denying most the right to reasonable accommodations but granting to others, because of their employers' misperceptions, a right to reasonable accommodations no more limited than those afforded actually disabled employees." *Strippit*, 186 F.3d at 917. Like "regarded as" plaintiffs, "record of" plaintiffs do not presently suffer from a substantially limiting impairment. *Compare* 42 U.S.C. § 12102(B) (record of impairment), *with id.*

Sioux Valley's motion for summary judgment as to Barnes's failure-to-accommodate her record of and perceived disability claims.

### C. "Record of Disability" Claims

■ Like Barnes, Sioux Valley did not address Barnes's discrete claims under Count II of her complaint. However, Sioux Valley contends that the mere fact it was aware of Barnes's rheumatoid arthritis is insufficient to find that it took adverse employment action against Barnes *because of* her disability.

■ To establish the existence of a record of a disability, an individual must show that she "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." *Costello v. Mitchell Pub. Sch. Dist. 79*, 266 F.3d 916, 924 (8th Cir.2001) (citing 29 C.F.R. § 1630.2(k)). "In order to have a record of a disability, an employee's 'documentation must show' that she has a history of or has been subject to misclassification as disabled." *Taylor v. Nimock's Oil Co.*, 214 F.3d 957, 961 (8th Cir.2000) (citing *Strippit*, 186 F.3d at 915). Sioux Valley does not dispute that Barnes has a record of a substantially limiting impairment of which Sioux Valley was aware, but rather argues that there is no evidence that it rescinded Barnes's employment offer because of that record. Instead, it argues

that the decision was based on a current examination by a qualified medical provider and an individual analysis wherein it was concluded that Barnes could not perform the essential functions of the position.

The court disagrees. For instance, a reasonable fact-finder could infer, based on Freeman's letter to Dr. Hewitt, that Sioux Valley sent Barnes to Dr. Hewitt for evaluation because of her record of rheumatoid arthritis. Furthermore, a reasonable jury could infer discriminatory animus prompted Sioux Valley's decision based on Freeman's assertions that she referred Barnes to Dr. Hewitt solely because of Barnes's recent foot surgery, when in fact the letter to Dr. Hewitt mentions only Barnes's arthritis diagnosis. In addition, the fact Sioux Valley did not seek clarification or further information from Barnes's surgeon and treating physician, in spite of their unconditional releases to work, could lead a reasonable finder of fact to conclude that Sioux Valley was basing its employment decision on Barnes's record of a disabling impairment. Therefore, Sioux Valley is not entitled to summary judgment on Barnes's "record of" claim because she has generated a fact question as to whether discriminatory animus motivated Sioux Valley in their decision-making process.

### D. "Regarded As" Claims

■ Barnes also alleges a claim, under 42 U.S.C. § 12102(2)(C), that Sioux

§ 12101(C) (regarded as). Interpreting the ADA to impose a duty of accommodation on employers for "record of" disability claimants would significantly broaden the sweep of the ADA—a result against which *Strippit* militates.

Nevertheless, the parties should not interpret this conclusion to mean that, under no circumstances, did Sioux Valley have a duty to accommodate Barnes's non-disabling lifting and standing restrictions. In examining whether there exists a genuine issue of material fact as to whether Barnes is substantially limited in any major life activities, the court

examined the Seventh Circuit's *Vande Zande* decision, which held that "an intermittent impairment that is a characteristic manifestation of an admitted disability is ... a part of the underlying disability and hence a condition that the employer must reasonably accommodate." *Vande Zande*, 44 F.3d at 544. Thus, if Barnes successfully establishes that her rheumatoid arthritis is a substantially limiting impairment, subsequent limitations that arise out of her rheumatoid arthritis but are not themselves substantially limiting may warrant reasonable accommodation.

Valley regarded her as disabled. The Supreme Court has interpreted this section of the ADA as follows:

There are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. In both cases, it is necessary that a covered entity entertain misperceptions about the individual—it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting.

*Sutton v. United Air Lines,* 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999); *see Conant v. City of Hibbing,* 271 F.3d 782, 784 (8th Cir.2001) (citing *Sutton,* 527 U.S. at 489, 119 S.Ct. 2139).

The Eighth Circuit Court of Appeals has observed that it is not a question of whether the defendants treated the plaintiff adversely "because of his or her feelings about the plaintiff's physical or mental impairment," *Weber,* 186 F.3d at 915, but a question of whether the defendants' treatment of the plaintiff was a result of the defendants' harboring " 'archaic attitudes,' erroneous perceptions, and myths that work to the disadvantage of persons with or regarded as having disabilities." *Brunko v. Mercy Hosp.,* 260 F.3d 939, 942 (8th Cir.2001). "An employer's knowledge of an employee's disability, without more, is not sufficient to establish a 'regarded as' claim." *Kellogg,* 233 F.3d at 1089; *accord Conant,* 271 F.3d at 786 (holding that mere fact that a defendant is aware of a plaintiff's past medical condition and might perceive that the plaintiff still has the medical condition or is likely to develop a medical condition in the future is insufficient to

prove a "regarded as" claim) (citing *Kellogg,* 233 F.3d at 1089; *Aucutt v. Six Flags Over Mid–America, Inc.,* 85 F.3d 1311, 1320 (8th Cir.1996)); *Taylor,* 214 F.3d at 961 (concluding that an employer's knowledge of an employee's medical difficulties and expression of concern does not amount to treating an employee as if he had a permanent disability that substantially limits his life activities).

In this case, Sioux Valley argues that its decision to rescind Barnes's employment offer was, again, based on Dr. Hewitt's medical evaluation and subsequent lifting and standing restrictions, which Sioux Valley determined prevented Barnes from performing the essential functions of the LPN position. Barnes claims that it was because of Sioux Valley's belief in myths, fears, and stereotypes about rheumatoid arthritis that Sioux Valley sent her to Dr. Hewitt for a second health evaluation; she expressly does not contend that she is regarded as substantially limited in the major life activity of lifting. By not responding to Sioux Valley's characterization of her claim, the court finds that Barnes has abandoned her perceived disability claim insofar as it related to her argument that Sioux Valley retracted its employment offer because it regarded her as disabled. Furthermore, Sioux Valley filed a reply brief to Barnes's resistance, but did not address her improper testing argument with respect to Barnes's "regarded as" claim. Instead, Sioux Valley focused its analysis on Barnes's "record of disability" claim, which it did not address in its moving papers, nor did Barnes resist on that ground. Thus, Barnes's improper testing because of a record of disability claim is not before the court on this motion for summary judgment, but rather will be resolved at trial. However, because Barnes did not resist Sioux Valley's contention that it did not retract its offer of employment because of a perceived disability, the

court finds that there exists no genuine issue of material fact and grants summary judgment on this claim.

## IV SIOUX VALLEY'S MOTION TO STRIKE

██ The final motion before the court is Sioux Valley's Motion To Strike Portions of Plaintiff's Response to Defendants' Statement of Undisputed Material Fact and Plaintiff's Eleventh Hour Affidavit, filed October 21, 2002. (Doc. No. 48). The gist of Sioux Valley's motion as it pertains to Barnes's response to Sioux Valley's statement of undisputed facts is that Barnes failed to comply with Local Rule 56.1(b), which provides that "[a] response to an individual statement of material fact that is not expressly admitted must be supported by references to those specific pages, paragraphs, or parts of the pleadings, depositions, answers to interrogatories, admissions, exhibits, and affidavits that support the resisting party's refusal to admit the statement, with citations to the appendix containing that part of the record." The Local Rules further provide that "[t]he failure to respond to an individual statement of material fact constitutes an admission of fact." LOCAL RULE 56.1(b). Sioux Valley urges this court to strike various portions of Barnes's response because they either are not statements of fact or contain no reference to a specific page in the record.

The court agrees that Barnes did not strictly comply with the Local Rules in her resistance papers. And while Barnes's noncompliance regarding citation to the record resulted in significant effort on the part of the court in pinpointing factual references, Sioux Valley was not prejudiced by Barnes's noncompliance. Furthermore, the court understands the rules and would not interpret arguments to be facts. Thus, while legal arguments rather than facts are not appropriate in a Statement of Disputed Facts under Local Rule

56.1, the court did not consider those arguments in its ruling. The court recognizes its authority to strike portions of Barnes's resistance papers but will exercise its discretion to deny Sioux Valley's motion because Barnes's noncompliance had no bearing on the disposition of Sioux Valley's motion for summary judgment.

██ Sioux Valley also seeks stricken from the record Barnes's affidavit, which she filed October 11, 2002 as part of her resistance to Sioux Valley's summary judgment motion. In that affidavit, Barnes attempts to clarify prior deposition testimony and, furthermore, makes several conclusory statements that Sioux Valley contends lack personal knowledge. This court recently discussed the applicable standards to a challenge of such an affidavit in *Helm Financial Corp. v. Iowa Northern Railway Co.*, 214 F.Supp.2d 934, (N.D.Iowa 2002). With respect to Barnes's alleged contradictory testimony, the standards to a challenge include:

> As to contradiction of prior testimony, the Eighth Circuit Court of Appeals recently reiterated the following principles: It is well-settled that "[p]arties to a motion for summary judgment cannot create sham issues of fact in an effort to defeat summary judgment." *American Airlines, Inc. v. KLM Royal Dutch Airlines, Inc.*, 114 F.3d 108, 111 (8th Cir. 1997). Consequently, a party should not be allowed to create issues of credibility by contradicting his own earlier testimony. Ambiguities and even conflicts in a deponent's testimony are generally matters for the jury to sort out, but a district court may grant summary judgment where a party's sudden and unexplained revision of testimony creates an issue of fact where none existed before. Otherwise, any party could head off a summary judgment motion by supplanting previous depositions ad hoc with a

new affidavit, and no case would ever be appropriate for summary judgment. *Wilson v. Westinghouse Elec. Corp.*, 838 F.2d 286, 289 (8th Cir.1988) (internal citations and quotation marks omitted). *Bass v. City of Sioux Falls*, 232 F.3d 615, 619 (8th Cir.1999); *accord Dotson v. Delta Consolidated Indus., Inc.*, 251 F.3d 780, 781 (8th Cir.2001) ("We have held many times that a party may not create a question of material fact, and thus forestall summary judgment, by submitting an affidavit contradicting his own sworn statements in a deposition. *See, e.g., American Airlines, Inc. v. KLM Royal Dutch Airlines, Inc.*, 114 F.3d 108, 111 (8th Cir.1997), and *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1364–65 (8th Cir.1983)."); *Plymouth Foam Prods., Inc. v. City of Becker*, 120 F.3d 153, 155 n. 3 (8th Cir. 1997) (to the extent that the affiant's affidavit conflicts with his earlier deposition testimony, his affidavit testimony should be disregarded); *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 402 (8th Cir.1995) (same). The Eighth Circuit Court of Appeals has explained that the rule that a party cannot create a "sham" issue of fact in an effort to defeat summary judgment by filing an affidavit directly contradicting prior deposition testimony "is a sound one," because "if testimony under oath could be 'abandoned many months later by the filing of an affidavit, probably no cases would be appropriate for summary judgment.'" *Herring v. Canada Life Assur. Co.*, 207 F.3d 1026, 1030 (8th Cir.2000) (quoting *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1366 (8th Cir.1983)).

However, the Eighth Circuit Court of Appeals has also explained that, where the affidavit testimony seems consistent with the affiant's prior deposition testimony, or simply adds more detailed information, the court may properly consider the affidavit on summary judgment. *Bass*, 232 F.3d at 619. Similarly, the court has recognized "that there are 'narrow circumstances' in which a subsequent affidavit is appropriate, such as to explain certain aspects of the deposition testimony or where the prior testimony reflects confusion on the part of the witness." *Herring*, 207 F.3d at 1030–31 (citing *Camfield Tires, Inc.*, 719 F.2d at 1364–65). In such circumstances, "it would be for the jury to resolve the discrepancy in the deposition testimony and the affidavit." *Id.* at 1031.

*Helm*, 214 F.Supp.2d at 954–55.

In this case, Sioux Valley objects to the inconsistency between Barnes's concession that she is not limited in her ability to walk, eat, sleep, do things around the house, drive, perform hobbies, and walk several blocks and her affidavit testimony in which she states that she thought Sioux Valley's counsel was questioning her about her abilities to perform work-related duties. In its motion to strike, Sioux Valley points out that its questioning of Barnes made it clear that counsel was not asking about work duties. Namely, plaintiff was asked "Able to do things around the house that you would normally do?"; "You hadn't been working for several years, Your children are grown. What types of things would you be doing on a normal day-to-day basis?"; and, finally, "So was the rheumatoid arthritis on August 16th or 18th of 2000 restricting any activities that you wanted to engage in that you couldn't do because of the arthritic condition?" [Deft.'s App., at 21–22].

The court agrees that Barnes's affidavit is inconsistent with her prior deposition testimony. However, the court did not rely on Barnes's inconsistent responses in finding that she has created a genuine issue of material fact as to whether she is

actually disabled. That is so because the court found, above, that Barnes's rheumatoid arthritis may be a "disability" that periodically surfaces. Thus, it is not of fatal consequence that, on August 16th or 18th of 2000, Barnes was not unable to engage in any activities because of her arthritis. Thus, the court finds that the most prudent route is to deny Sioux Valley's motion and to let the jury decide the import, if any, of Barnes's statements. This is so because Barnes's inconsistent testimony and conclusory statements had no bearing on the court's conclusion that she has generated a material fact question as to her failure-to-accommodate claim.

## V. CONCLUSION

THEREFORE, the court denies as moot the defendants' motion to dismiss insofar as it was based on the lack of personal jurisdiction over Sioux Valley Hospitals & Health System. This is so because the court **grants the defendants' motion to substitute Sioux Valley Regional Health Services for Sioux Valley Hospitals & Health System as the proper party defendant. The court hereby directs the Clerk of the Court to amend the caption of the complaint to substitute Sioux Valley Regional Health Services for Sioux Valley Hospitals & Health System** as a defendant in this case.

With respect to the parties' cross-motions for summary judgment, the court **denies plaintiff's Partial Motion For Summary Judgment** because there exist material questions of fact as to whether Barnes is disabled within the meaning of 42 U.S.C. § 12102(2)(A) and as to whether she was "qualified." The court, for the same reasons, **denies defendant's Motion For Summary Judgment on this count (Count I)** as well.

However, because the court concludes there is no viable failure-to-accommodate claim when the claimed disability is a "rec-

ord of" or "regarded as" one, the court **grants Sioux Valley's motion insofar as Barnes asserted failure-to-accommodate claims in Counts II and III** of her complaint. The court also **grants Sioux Valley's Motion For Summary Judgment as to Barnes's failure-to-hire because of a perceived disability** claim having found that Barnes abandoned this claim by failing to resist the defendant's contention that its decision was motivated by proper medical testing. At the same time, the court finds there exists sufficient evidence upon which a reasonable jury could conclude that Sioux Valley's decision to retract its employment offer was based on a record of disability (Count II) and **denies Sioux Valley's motion** in this regard. Because the remaining claims are not properly before the court on these motions for summary judgment, the court expresses no opinion on Barnes's remaining claims.

In short, Barnes's claims—which either survived these motions for summary judgment or were not before the court—that will proceed to a jury trial are: (1) failure-to-accommodate an actual disability, (2) failure-to-hire because of an actual disability claim, (3) failure-to-hire because of a record of disability, (4) improper testing because of a record of disability, (5) improper testing because of a perceived disability.

And finally, the court **denies Sioux Valley's Motion To Strike** because the challenged portions of Barnes's resisting papers and affidavit did not effect the disposition of Sioux Valley's motion.

**IT IS SO ORDERED.**